Robert **MARTARELLA**, by his next friend and Law Guardian Charles Schinitsky, et al., Plaintiffs,

v.

Florence **KELLEY**, Administrative Judge, and The Family Court Judges of the State and City of New York, et al., Defendants.

No. 71 Civ. 3159.

United States District Court,
S. D. New York.

Oct. 16, 1972.

Charles Schinitsky, The Legal Aid Society, Brooklyn, N. Y., for plaintiffs; James D. Silbert, and Mara T. Thorpe, Brooklyn, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Maria L. Marcus, and John G. Proudfit, New York City, of counsel.

J. Lee Rankin, Corp. Counsel, New York City, for defendant Sugarman; Yvette Harmon, New York City, of counsel.

LASKER, District Judge.

The rapid urbanization of the United States in this century and the heavy influx of the poor to the cities in the last two decades have produced a numerous class of children whose conduct, although not criminal in character or legal designation, results in their incarceration.

Robert Martarella and his fellow plaintiffs [1] are members of that group —alleged or adjudicated to be "Persons In Need of Supervision" (PINS) pursuant to § 732 of the Family Court Act of New York (The Act). They bring this civil rights action for a declaration that their temporary detention in the "maximum security" facilities,—Spofford, Manida and Zerega, juvenile centers operated by the City of New York— deprives them of due process and equal protection and constitutes cruel and unusual punishment under the conditions prevailing at those institutions.[2]

---

1. At the time the complaint was filed, Martarella had been confined at Spofford because he had run away from home on seven occasions for periods up to ten days in the prior nine months and refused to go to school. At first, he was paroled for investigation. His mother, however, reported that he ran away again and a warrant was issued. On the return of the warrant, he was remanded for full study and report so that a placement other than a training school could be explored. However, his mother refused to take him home and remand was continued for several weeks. He was again placed on probation but a week later ran away from home and was found unconscious in a school hallway. His probation was revoked and he was remanded for about six weeks with weekend parole privileges. A full study and psychiatric report were ordered. He was paroled again and ran away. On his return, on a warrant, the court ordered placement at Lincoln Hall, a privately operated institution.

Martarella's case is not unique. Athough no precise facts are in evidence as to the rate of recidivism among children in the centers, the witnesses agreed that recidivism was significant. A case like Martarella's presents difficult problems of final disposition and these difficulties may explain in part the number of cases of long stays at the centers. The details of the cases of the other plaintiffs are set forth in the pleadings (Complaint Par IV, Answer Pars. V through VIII inclusive). None of the other plaintiffs testified at the trial and the particular facts of their cases have no determining influence in regard to the issues before us.

2. Jurisdiction is predicated on 28 U.S.C. § 1343(3)(4), this being a suit brought under 42 U.S.C. § 1983. The action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rules 57 and 65 of the Fed.R.Civ.Pr.

The plaintiffs moved for preliminary injunctive relief. Pursuant to Rule 65 (a)(2), Fed.R.Civ.Pr., the trial of the action was consolidated with the hearing of the application.[3]

A "Person In Need of Supervision" is defined in § 712(b) of the Act as "a male less than sixteen years of age and a female less than eighteen years of age who does not attend school in accordance with the provisions of part one of article sixty-five of the education law or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent or other lawful authority."

The boys at Spofford range in age from 7 through 15; the girls at Manida and Zerega from 7 through 17.

The Family Court Judges are authorized, by § 739 of the Act, to direct that a PINS be detained if "(a) there is a substantial probability that he will not appear in court on the return date; or (b) there is a serious risk that he may before the return date do an act which if committed by an adult would constitute a crime."

The Presiding Justices of the Appellate Division are responsible for the designation of appropriate detention centers for PINS.

The Director of the Office of Probation was, at the time this suit was instituted, responsible for the administration and operation of the centers. In November 1971, the supervision of the centers was transferred to the Department of Social Services of the City of New York, and Jule M. Sugarman, Commissioner of Social Services, has been added as a defendant.

The injunctive relief sought by the plaintiffs is to prevent the Family Court Judges from remanding PINS to the centers, to order the Presiding Justices of the Appellate Division to designate non-secure facilities which comply with New York law and the Federal Constitution as to the care and treatment of children in custody, and to order the administrator of the centers to close

3. The Record in this action consists of the pleadings, defendants' answers to interrogatories, a stipulation of the parties, the affidavits of John Wallace, Director of Probation, City of New York, and Jule Sugarman, Commissioner of Social Services, and other papers submitted in connection with plaintiffs' motion for a preliminary injunction, including "An Inquiry Into the Juvenile Centers Operated by the Office of Probation" (Stone Report, June 1971) and "Juvenile Detention Problems in New York City", a report by the Citizens Committee for Children of New York, Inc. (Dec.1970), a small number of exhibits admitted in evidence at the trial, and the testimony of nine witnesses for the plaintiffs; Robert Martarella, a named plaintiff who has been in custody at Spofford, Mel Rivers, President of the Fortune Society, an organization devoted to the assistance of former prisoners and to prison reform, and who, himself, was a Spofford inmate in 1958; Jill Fein, a seventeen year old girl who has been in custody at Spofford and Manida; Dr. Esther Rothman, an expert in the field of child care and principal of the Livingston School for Girls, a special school for very aggressive girls; Dr.

Howard W. Weiner, New York City psychiatrist, psychiatrist for the Bureau of Child Guidance of the Board of Education of New York City and former Assistant Director in Charge of the New York City Division of Wiltwyck School (a school for boys who are PINS or delinquent); for the defendants: Dr. Gideon Seaman, psychiatrist and Associate Director of residency at Creedmore State Hospital, William Ocean, a seventeen year old boy who has been in custody at Spofford six or seven times; Robert E. Schulman, Ph.D., a clinical psychologist, Director of the Division of Psychiatry at The Menninger Foundation, Assistant Professor of Law at the University of Kansas, and Director of the Juvenile Clinic at the University; Hon. Florence M. Kelley, Administrative Judge of the Family Court of New York City; John A. Wallace, Director of Probation for the Courts of New York City; and Dr. Edward D. Greenwood, child psychiatrist with The Menninger Foundation, and consultant to the Boys Industrial School in Kansas.

References to the witnesses' testimony are made to the Transcript (Tr) where necessary.

Manida and Zerega permanently, and Spofford until it is made "safe, sanitary and decent for its inmates."

They also move for determination of the case as a class action.

Spofford, Manida and Zerega ("the centers", except where reference is made to a specific facility) are institutions at which PINS *and* juvenile delinquents are, (on what is theoretically termed a "temporary" basis), detained together pending the permanent disposition of their cases by long term custody or otherwise. The term "theoretically" must be emphasized because in a significant number of cases, as we shall see below, the "temporary" nature of the detention is lengthened to as much as 100 days or more.

Generally speaking, children who have been adjudicated as PINS are truants, or runaways, or have been ungovernable at home. The acts for which they may be brought before a court, detained at the centers and thereafter held in custody for a term would not constitute crimes if committed by an adult.

The acts committed by juvenile delinquents (JDs) are criminal in character (in contrast to the acts of PINS). A JD is defined by § 712(a) of the Act as "a person over seven and less than sixteen years of age who does any act which, if done by an adult, would constitute a crime".

Plaintiffs' major contentions may be summarized as follows:

(1) The incarceration of non-criminal children in maximum security detention under conditions which plaintiffs describe as punitive, hazardous and unhealthy, and in the absence of rehabilitative treatment constitutes cruel and unusual punishment and a violation of due process under the Eighth and Fourteenth Amendments respectively.

(2) Classifying and housing PINS together with juvenile delinquents (JDs) (rather than with neglected children) for purposes of temporary detention is arbitrary and capricious and violates the equal protection clause.

The defendants deny that the conditions at the centers are punitive or (with exceptions) hazardous or unhealthy, and assert that the program provided for the plaintiff class provides treatment and rehabilitation to the extent possible in the context of temporary detention. Consequently, they assert that no cruel and unusual punishment or deprivation of due process exists. As to the issue of equal protection, they claim that housing of PINS with JDs is a rational and professionally accepted method of classification for temporary detention, so that no constitutional violation exists.

Finally, defendants argue that the court lacks jurisdiction and that in any event, since the placement of each child involves different factors and circumstances, the case should not be declared a class action under Rule 23, Fed.R.Civ.P.

\* \* \*

Before we commence an exploration of the facts and the questions of law which they present, it is essential that the issues be focused. The plaintiffs do not challenge the constitutionality of the Family Court Act or the authority of Family Court judges to remove a non-delinquent child from his home on proper grounds. They do not contest the propriety of confining non-delinquent children in *any* secure setting. The issue they raise is limited to whether PINS may constitutionally be confined in the three named detention centers: Manida, Zerega and Spofford, and whether they may be held in custody in the same facilities as juvenile delinquents.

### The Centers

On July 17th, 1970, the Appellate Divisions of the New York Supreme Court ordered an inquiry into the conditions, maintenance and management of Spofford, Manida and Zerega. Joseph Stone, Judge of the Criminal Court of New York City, Robert K. Ruskin, Commissioner of Investigation of the City, and Donald H. Goff, General Secretary of the Correctional Association of New York, were named as panel members. Their exhaustive and authoritative re-

port, issued January 20th, 1971, commonly known as the Stone Report, states at its outset:

> "The history of New York City's juvenile detention centers is a history of dead-end studies and investigations. Although many reports have been written and inadequacies, abuses and brutalities have been spotlighted, meaningful improvement has not been achieved."

There follows a description of nearly a score of inquiries (commencing with investigation of earlier facilities as far back as 1906) cataloguing countless deficiencies, but ending constantly in the frustration which has brought the constitutionality of those conditions before this court. The Stone Report recommended that Manida and Zerega be closed and that Spofford be used temporarily only for children who require maximum security detention. A contemporaneous study, "Juvenile Detention Problems in New York City," by the Citizens' Committee for Children of New York, Inc., recommended that "all the buildings now used for detention purposes should be closed or converted with reasonable speed."

We will refer hereafter to other relevant findings and recommendations of the Stone and Citizens' Committee Reports. We proceed to a resume of the facts as to the present physical conditions at the shelters, the restraints imposed on the children, and whether rehabilitative treatment is furnished them.

*Physical Facilities and Restraints*

*Spofford*: Spofford is "secure" not only from the outside world, but internally as well. The building is surrounded by a high wall. Although individual sleeping rooms are left open at night unless the

particular child poses a risk to himself or others, the children (boys) are otherwise locked in their dormitories, recreation rooms or classrooms (Stipulation No. 2 and admitted allegations of Par. 20A (1) of the complaint). Each corridor of the building that leads to the dormitories, classrooms, dining halls or offices has metal doors at each end that are locked at all times. An electronically locked metal door controls movement in and out of the buildings. The windows are secured from inside by a screen made of institutional netting. Each screen is secured to the window by a frame which is hooked to the window frame, (Stipulation No. 2).

When boys arrive at Spofford their personal clothing is taken from them and they are issued uniforms of blue jeans and T-shirts on whose fronts is an institutional legend (admitted allegations of Par. 20A(6) of the complaint).

*Manida*: Manida is also surrounded by a high wall. The girls there are under lock and key: specifically, the doors to each unit, which contains an "open" dormitory, day room and bathroom, are locked; the doors to each corridor of the building and the doors to the stairway are locked at all times. (Stipulation No. 3 and admitted allegations of Par. 20B (1) and (3) of the complaint.)

*Zerega*: The girls at Zerega are confined to prefabricated metal buildings. (Stipulation No. 4; admitted allegations of Par. 20C(1) of the complaint; Stone Report p. 30). Like the other centers, Zerega is surrounded by a high wall. The buildings contain a dormitory and a room that serves as a schoolroom and recreation center.

The most comprehensive description of the physical characteristics of the centers is found in the Stone Report.[4]

4. The Stone Report was submitted by plaintiffs as an exhibit to their memorandum in support of the motion for a preliminary injunction. Although the testimony at trial consisted primarily of evidence as to the conditions of life at the centers (and of the validity or invalidity of the programs there as "treatment"), such testimony as did refer to physical conditions was consistent with the findings of the Stone Report. The defendants have not contested the Report's description of the physical arrangements at the centers, and we find the facts in accordance with that catalogue which was made upon an objective and detailed study by experts.

*Spofford* is located on a four-acre tract in the Southeast Bronx. Completed in 1958, it includes dormitories, schoolrooms, gymnasium, swimming pool, conference rooms and a room for religious purposes, infirmary, cafeteria, library and other miscellaneous supporting facilities. There are outdoor play areas for softball, shuffleboard, paddle tennis, basketball, handball and volleyball. In spite of these virtues, the Stone Report states that the facility is "fraught with problems related both to architectural layout and to maintenance." For example, it is ½ of a mile from one end of the structure to the other; the building is "poorly designed for its functional purpose"; space for receiving children is inadequate so that searching is often conducted in the toilet facilities; there is lack of sufficient area for visitation; the school is divided among three separate floors, creating "traffic problems"; lighting is "generally inadequate", the rooms are often cold in winter, and the fire alarm system—at least at the date of the report—was in disrepair.

*Manida*: This center is situated on a two-acre tract in the Southeast Bronx. There are three buildings: a main three-story structure; a two-story cottage, and a one-story attached residence. There is an outdoor volleyball court and baseball diamond. The main building was constructed in 1904 as a monastery, and was renovated in 1954. The dining room in the basement and dormitories on the second and third floors were not renovated and, as the Stone Report picturesquely describes them, "survive as remnants of the monastic era." The gym is "dilapidated". The cottage is no longer in use. As far back as 1963, the Federal Department of H.E.W. reported to the director that Manida was, as the Stone Commission reports the findings, "unsuitable for the detention care of children, that no remodelling or repair could make it suitable, and that it should be replaced . . ." and "because of lack of space and general layout, a detention program could not be provided." The Stone Commission found that "since 1963 the situation has not improved" and that its serious state of disrepair was such that "Physically, Manida is depressing." To compound the situation, "The deplorable condition of Manida was exacerbated by a fire on November 14th, 1970 which destroyed two dormitories. All of the children are now being housed in the remaining dormitories which adds to the problems of the institution."

The defendants have stipulated that Manida "is inappropriate for the detention of children." (Stipulation No. 6 and admitted allegations of Par. 25B(4) of the complaint).

*Zerega*: Zerega was constructed in 1962 as a temporary facility and is located on a two-acre "marshy" tract in the Central East Bronx. It consists of eight buildings which the Stone Report (and the complaint) describe as "Quonset huts," and the defendants call "prefabricated metal structures." There is an outdoor skating rink, basketball court and shuffleboard court. The Stone Report states (p. 30):

"The buildings are sinking. This becomes particularly apparent after periods of heavy rainfall. The settling of the buildings causes cracks in the hot water pipes suspended from the ceilings, which could result in serious injury if a pipe should burst. Leaks in the roof are common . . ."

The buildings are "hot in the summer and cold in the winter" and "there are insufficient waiting room facilities for visitors which discourages visiting during inclement weather."

As of the date of the Report (January 1971) it was "contemplated that the facility will have to be abandoned." This was still the case at the time of trial.

It will be noted that all of the centers are located in the East Bronx. Since they are the only detention centers in the city for PINS, their location in one corner of the metropolis makes it a long journey for many family visitors who come from Queens, Brooklyn and Staten Island, and acts to limit the actual number of visits which the children receive.

(Admitted allegations of Par. 31(b) of the complaint).

The number of boys in custody at Spofford or of girls at Manida and Zerega has varied substantially at different times, but seems to show a declining trend as plans for new or substitute facilities, which we describe below, come into fruition.

Spofford has a capacity of 300, and there were times in the past when it was seriously overcrowded. Those days seem to be over. In May of 1971 the population ranged from a low of 183 to a high of 221; while in May 1972, the spread was between 110 and 173. (Monthly Population Report May 1972, by Director of Detention Services; Human Resources Administration, Institutional Services).

The centers' total capacity for girls is 170 (idem). In May of 1971, 93 were at Manida and Zerega, as compared to 83 in May of 1972 (idem).[5]

Although the centers were established and are conducted solely for temporary detention until final disposition of a child's case, the agonizing difficulty of permanently placing some children elsewhere results in many stays which are anything but temporary.

The average time spent at the centers as of the time of trial was only 12.06 days for girls and 16.81 for boys (Tr. 393); but unhappily, many remain much longer. For example, plaintiff Martarella was at Spofford for six months (Tr. 7), and William Ocean, a defense witness, for seven months (Tr. 214). John Wallace, Director of New York City Probation Department, testified that in 1969, when the total population of the centers was clearly larger than it is today—due to creditable efforts since then by the Family Court to reduce the number of children remanded to secure detention and to speed up the permanent placement of those at the centers—there were 142 children at one time who had been in custody for more than 30 days, and 30 or 40 of those had been in custody for over 100 days. In May of 1971, 44 children had been detained over 30 days, and in

5. In their answers to plaintiffs' interrogatories, defendants Jule Sugarman, Commissioner of Social Services of the City of New York, and John A. Wallace, Director of the Office of Probation (by reference to Sugarman's answers) have outlined plans to close Manida and Zerega and to establish non-secure facilities which would accommodate 172 children. The answers also express the "hope" that private agencies may accept more PINS for detention and that the population at the centers can be reduced by obtaining quick placements through coordination with the State Division for Youth.

At the request of the court, the answers to the interrogatories were brought up to date and new responses were furnished June 16th, 1972, by Commissioner Sugarman and July 13th, 1972, by Wayne Mucci, Director of Operations of the Bureau of Institutions and Facilities of the Department of Social Services. As of those dates, it was planned to close Zerega in the month of August, 1972 [it has since been closed] and Manida nine months thereafter. 28 beds are now available for use in foster homes. Two group homes for boys providing a total of 16 beds were opened in July 1972. It is planned to open a boarding home for five youths in November of this year. The Department of Social Services is working with the Council of Voluntary Private Agencies to provide alternatives to detention. The limitations of such cooperation may be indicated, however, in Mr. Mucci's statement that: "The member agencies, *if interested*, will shortly be asked to submit proposals for the establishment and operation of non-secure group facilities." (Emphasis added) The Department of Social Services is also working with the State Division of Youth to reduce time lags in placements. Five further Agency boarding homes consisting of six apartments have been proposed and twelve or more Group Homes, caring for eight children each. Two of the Group Homes were opened in July 1972, but the remainder will not be open until July 1973, at the earliest. Prior plans for the establishment of group residences caring for twenty children each have been abandoned as producing some of the same problems created by the large scale institutions now in use. With the exception of the closing of Zerega, these developments and plans, important as they are, do not moot any of the issues in the case although they are, of course, relevant as to what injunctive relief should be afforded.

May of 1972 the number was still 34, of whom one had been in custody for 115 days, three more than 90 days, seven 80 days or more, four over 60 days, nine more than 50 days, three more than 40 days, and the remainder over 30.

The difficulty of permanent placement of PINS in such cases is poignantly illustrated by two examples given in the recent report of the Committee on Mental Health Services Inside and Outside the Family Court in the City of New York (1972), appointed by the Presiding Justices of the First and Second Appellate Divisions of the New York State Supreme Court (defendants here) and conducted under the chairmanship of Hon. Justine Wise Polier (a defendant here) entitled "Juvenile Justice Confounded: Pretensions and Realities of Treatment Services" (at pp. 29–30):

> "Donna C, found to be in need of supervision, was placed in the training school system [i. e., a state facility] after only a few efforts to secure private placement. Diagnosis: 'Passive, aggressive personality with explosive features.' The case summary reports, 'The original psychiatric and psychological reports actually spelled this child's doom relative to any private agency setting—note the statement, explosive features. Such a child is not acceptable to any private agency."

and

> "Amy J, a fourteen-year-old diabetic, spent ten months at Juvenile Center while the Court sought placement for her that would provide medical and psychiatric care. After she was rejected by two agencies because of 'lack of motivation, low academic achievement and a pattern of absconding' and by a third because of her medical condition, she was placed in the training school system."

While these stories of misery explain the causes of many long term detentions, they simultaneously confirm their existence and the probability of their continuance in the foreseeable future. Such long term confinement of significant numbers of children in a setting programmed solely for temporary detention is directly relevant to the question whether the "treatment" they receive is adequate as a matter of due process or under the Eighth Amendment.

### Restraints and Discipline

In addition to being locked institutions (internally and externally) whose male "inmates" must wear uniform clothing, there are other characteristics which the centers share with penal institutions. For example, according to Robert Martarella's uncontested testimony, children are required to walk in line from place to place without talking, and are "hit" or have a smoking break taken away if they get out of line. Knives are not generally furnished at meals. Homosexuality, both forced and consensual, exists in both girls' and boys' centers as what all parties appear to agree is an inevitable concomitant of incarceration.

The testimony of Mel Rivers, President of The Fortune Society, an organization dedicated to prison reform and the assistance of released prisoners, compared conditions in prison and Spofford. Rivers, who was once in custody at Spofford for a week in 1958, has also been confined in a State training school, a county jail, and for three years at Comstock Prison, his last term ending nine years ago. A year ago he visited Spofford as a consultant once a week for seven to ten weeks for "rap sessions" with the boys in custody, and made other visits as a member of a committee of the Stone Commission. When asked (Tr. p. 52):

> "In what way did you find that Spofford Juvenile Center is like, say, a county jail for adults or prison for adults?"

he replied (Tr. p. 53):

> "A Well, it is operated predominantly under the same type of a system, a count system, a march system. The counting probably in Spofford is done more silently than it is done in an adult facility. It is probably done by bed-checks, but it is still a count.

THE COURT: You mean to be sure everybody is there?

THE WITNESS: Yes, to be sure everybody is there.

The type of regimentation, to do this, to do that, that type of situation, the locking in, the inability to be really part of what is going on outside.

In juvenile institutions I realize you get out in the yard to play some ball, whereas in an adult facility you don't. But in the final analysis you are back inside that enclosure. The windows are thick. There is a locked-in type of a situation.

In juvenile institutions you have like a dormitory attached to a day room, and a good portion of your time is spend in the day room playing cards or looking at TV.

Q Is this how it is up at Spofford?

A At Spofford. And in county jails you have a day room that is attached to a prison corridor, like cells, and predominantly you spend your day in the day room playing cards and watching TV. So it is really somewhat the same system that it is governed by and run by. It is just labelled different, juvenile institutions or adolescent or adult facilities."

Dr. Esther Rothman, a psychologist, is the principal of the Livingston School for Girls, a special high school run by the New York City Board of Education for very aggressive girls. She was a visiting member of the detention committee of the Stone Commission and of the task force of the Citizens' Committee for Children's committee on probation, which prepared the 1971 report on the centers referred to earlier. She has visited all the centers on a number of occasions over a period of thirteen years, the last time only a few months before the trial. She testified (Tr. p. 71):

" . . . the tone of all the facilities is one of punishment and getting even with kids and teaching them a lesson, and I never felt that there was any real treatment or any real approach to helping children.

Q How would you describe Spofford?

A In just that way, as a penal institution."

(Tr. p. 72)

"Q In your professional opinion what would you say were some of the effects of secure detention on non-delinquent children?

A It is like asking me what is the effect of a concentration camp."

In Dr. Rothman's view a child does not see running away from home or truancy as harming any one else, and " . . . it is punitive when you are locked up some place having done nothing." (Tr. p. 73, 13ff).

The only expert witness for the defense who had visited any of the centers was Dr. Gideon Seaman, who made a one-day trip to Spofford and Manida for the purpose of testifying in this case (Tr. p. 186), and who in the course of his professional work has interviewed about a dozen children who had been in custody at one of the centers. He did not dispute the description of conditions at the centers, although, as indicated below, he differed markedly with plaintiffs' witnesses as to the phychological effect of the conditions and whether they constituted treatment that was professionally valid.

The punitive nature of custody at the centers is almost necessarily effected by the fact that it houses and mixes juvenile delinquents and PINS. While, as we shall see, the defendants assert that it is professionally and legally justified to treat the two classes in groups based upon their individual needs rather than their labels, nevertheless the necessities of the situation seem to require the enforcement of greater discipline when juvenile delinquents are included than would otherwise be the case. The JDs are, it must be remembered, charged with acts which would, except for the age of the actors, be crimes. The delinquencies range from the most minor to homicide and rape. While it is true that even a child who has committed one of these grievous acts may behave properly at the

center, and although many PINS are by definition "ungovernable", yet it is a reasonable inference that the presence of serious offenders within a group intensifies the imposition of discipline and restraint—if for no other reasons than those of security and of safety to staff personnel and other children. The result is that the most difficult child easily becomes the lowest common denominator for disciplinary purposes. In addition, as the defendants admit, " . . . discipline is often enforced against many in a group for the transgressions of only one child." (Admitted allegations of Par. 30(d) of the complaint.)

The Stone Commission found that "many children who did not require secure detention were being detained in the completely locked, prison-like (sic) maximum-security facility at Spofford. This practice is particularly shocking and offensive in the case of younger children. But since adequate facilities were not available for all children who simply needed a place to live pending disposition by the court, there was no alternative but to remand them to secure detention facility." (At 21–2)

*Treatment—General Observations*

█ What we have said, although the record would justify more, is sufficient to establish that, however benign the purposes for which members of the plaintiff class are held in custody, and whatever the sad necessities which prompt their detention, they are held in penal condition.[6] Where the State, as parens patriae, imposes such detention, it can meet the Constitution's requirement of due process and prohibition of cruel and unusual punishment if, and only if, it

furnishes adequate treatment to the detainee.[7]

None of the defendants quarrel with that proposition. The sole issue is whether the program for children at the centers measures up to constitutional standards of treatment.

We turn, therefore, to the facts relating to this critical subject: a subject as to which conclusions are more difficult to draw than as to those we have so far discussed. For one thing, the constitutional standards themselves are particularly difficult to assay. While decisions which we shall shortly review clearly pronounce the constitutional requirement of "treatment" as a quid pro quo for the exercise of the State's rights as *parens patriae*, they offer little guidance as to standards for determining the *adequacy* of treatment. Furthermore, as is perhaps to be expected in cases such as this, and in relation to a subject in which the outline of professional, like legal, standards is just emerging, the opinions of experts for the respective parties differ sharply as to the psychological and rehabilitative effect of the actual program at the centers. Finally, there are understandable limitations on the nature of the treatment that can be afforded—at least on an economically justifiable basis—at facilities established and intended for temporary detainees. These limitations may be constitutionally acceptable for those who are in fact temporarily detained but not for those who are actually held for long periods.

*Treatment—The Program*

Expert witnesses for the plaintiffs differed sharply with defense witnesses as

---

**6.** Nor does the availability of play, study, athletic and social experiences (such as dances) alter this conclusion, as the defendants argue. Even maximum security facilities for adults afford many such opportunities for their inmates. See, e. g., *Official Report of the New York State Special Commission on Attica* (Bantam Books 1972).

**7.** See authorities in discussion of questions of law below. The law of New York

fully recognizes this constitutional mandate. As Judge Polier wrote in the preface to the Report of the Committee on Mental Health (supra, at p. 2), construing the provisions of the Family Court Act: "In regard to persons found to be in need of supervision, the deprivation of freedom is authorized only if placement provides treatment."

to the therapeutic productivity of secure detention, and as to the adequacy of the actual treatment program at the centers; but all of the experts agreed that the beginning of treatment can be provided in temporary detention facilities if the tone of the institution is such as to make a child feel that a staff member is concerned about him, (e. g., Rothman Tr. 81; Greenwood Tr. 462; Schulman Tr. 260), and that the prerequisites for instilling such an attitude in the child are a staff (1) sufficient in numbers (2) adequately trained (3) having good relations with the children and (4) knowledgeable about the child's problems.

Judged by these standards, children detained for long terms cannot be said to receive treatment from the staff in the constitutional sense. Treatment from the staff of children detained for short terms is at best minimally acceptable. The phrase "from the staff" is deliberately used to emphasize the socio-medical nature of the treatment under discussion, differing as it does from the ordinary concept of "treating" a person kindly, indifferently or meanly. The concept of treatment as a constitutional quid pro quo for the state's right to detain those not guilty (or accused) of crime—children, the mentally ill, for example,—involves the delivery of therapeutic services—services which must emanate *from* the staff. Treatment in this sense goes beyond good will and kindness, although those virtues may be indispensible to the success of the therapy. While there have been some episodes of physical mistreatment or abuse of children by staff members at the centers,[8] they appear to be atypical, and the conclusions as to inadequacy of treatment "from the staff" do not imply any lack of good will or effort on the part of staff members in what is clearly a most difficult and demanding assignment. We have in mind rather the following facts:

(1) *Sufficiency in Numbers*: "Counsellors" are the staff members at a detention center working closest to the child. Defendants' own expert, Dr. Greenwood, testified (Tr. 429) that a professionally acceptable ratio of counsellors would be 3 counsellors to 24 children during the active day time hours. At Spofford, dormitories with 24 children are assigned 1, or sometimes 2 counsellors. (Testimony of John Wallace, Director of Probation Tr. 380–1).

The "caseworker" acts as a basic link between the center, and the Probation Office at the Family Court, and the position is of extreme importance in providing information as to the child. At the time of trial there were four caseworkers at Spofford to deal with the cases of 135 children. The inadequacy of this number is attested by the fact that there are unfilled openings for 13 caseworkers. The Stone Commission (Report p. 49) found that recruitment and retention of caseworkers for Spofford has been a long term, continuing problem, and there has been a high rate of turnover (Wallace Affidavit pp. 9–10).

The importance of psychiatric facilities for children whose behavior is by definition socially maladjusted is obvious. Diagnosis is critical to determination of appropriate permanent placement of the child, and actual treatment may be necessary during the course of stay: is inevitably necessary in extreme cases such as suicide attempts which have occurred sporadically.[9]

At the time of trial Juvenile Center had available only the per diem (part time) services of one psychiatrist (Wal-

---

8. See Stone Report p. 79. At the trial defendant Wallace agreed that there were occasional instances of physical abuse of children by staff members. Where appropriate, the case is referred to the District Attorney.

9. The Stone Report stated (at 84), "While generally not great in numbers, suicide attempts constitute a recurring and serious problem within the institutions, most notable at Spofford", and the defendants do not contest the fact. For details and statistics, see Stone Report pp. 84–88.

lace Tr. 386–7). Committed to serve a minimum of ten hours weekly, he had served as much as 22.

Although the defendants' answer (Par. XXIII) contends that, because the centers are short term care facilities, the "psychiatric services provided are necessarily diagnostic rather than therapeutic", defendants' answer to interrogatories #7 (which adopted the affidavit statement of Jule Sugarman, Commissioner of Social Services 9/2/71, par. 10(b)(2)), came closer to the mark: "Psychiatric services at the center need to be strengthened. Psychiatrists are necessary to perform both diagnostic evaluations—and to provide short term intensive therapy and crisis intervention for disturbed youths." Indeed Commissioner Sugarman frankly admitted (Response to interrogatory #13, 10/6/71), that "Psychiatric coverage for the detention centers, based upon the present population (which is not expected to increase) should at a minimum equal two full-time psychiatrists (70 hours per week) with provision for emergency consultation on nights, weekends and holidays (an additional 12–15 hours per month). This should be supplemented by a full time clinical psychologist."—"The distribution of psychiatric time between treatment and other activities depends upon the problems shown by the population." It was the Commissioner's opinion that "a minimum of 50% of the clinical time available should be spent in working and counseling with children, the remainder between diagnosis and planning for difficult cases and working with staff." [10]

Since the transfer of administration of the centers to the Social Services Department, significant efforts have been made to overcome the acknowledged deficiency in psychiatric services. At the request of the court,[11] current figures were furnished which showed (Answer to interrogatory #13 by Wayne Mucci, Director of Operations, Bureau of Institutions & Facilities, Department of Social Services) that by July 1972, psychiatric service available had increased from 13 to 38 hours per week; but, of course, even this creditable improvement falls far short of the Commissioner's prescription of 70 hours weekly. While, as of July 1972, there were plans to add to the staff one full time psychiatrist (or equivalent) and a clinical psychologist, (there was none on the staff then) these intentions and positions were unfulfilled at that time.

(2) *Staff Training*: Through no fault of their own, the training of staff members—at least for counsellors, who work most closely with the children, and with whom the children spend markedly more time than with other staff members—appears seriously inadequate for the difficult and specialized assignment of dealing with problem children: Persons in need of supervision.

While counsellors must have had prior experience working "with people", this need not include experience working with children (Wallace; Tr. 381). The holding of a college degree is not required (Tr. 381). The Stone Commission reported that no minimum educational requirement existed and that there was no formalized training procedure for new counsellors (except an orientation program concerned with the facility) prior to their permanent assignment, normally to supervise a dormitory of 24 children. (Stone Report p. 37). To remedy this deficiency the Commission recommended the creation of a position of training officer who would develop and supervise programs for pre-service and in-service training, (Report p. 43) and The Citizens' Committee Study also recommended that in-service training be instituted

10. Dr. Greenwood, a defense witness, was asked "Would you say an institution that has four case workers and one psychiatrist who devotes ten hours a week to the job is adequate personnel to deal meaningfully with 135 children in secure detention". He replied: "The obvious answer is no", although he went on to say that "_____ if there are no other funds available, it is more adequate than letting them run in the streets".

11. See Footnote 5.

(Tr. 83; Citizens' Committee Report p. 5). The centers have, to their credit, enlisted the professional guidance of the Play School Association Inc., a private social service agency, to provide courses in training counsellors for children's recreation activities; but this useful improvement is necessarily limited in scope. It is not intended to and does not remedy the deficiencies in training counsellors to deal with children on an overall basis.

Defendants' expert, Dr. Greenwood, testified that—especially where the ratio of counsellors to children was as low as it is at the centers—counsellors should have training in basic psychology of child adolescence (Tr. 425) to enable them to answer such questions as "What are the intellectual capacities of these kids? Do these kids learn like other kids? What are (sic) their social structure? What past experiences have interfered with their level of growing up?" He agreed that they needed "specialized training and experience in dealing with behavioral problem children or emotionally disturbed children". (Tr. 426) But the counsellors receive no such training. Nor is there available an in-service training program, which Dr. Greenwood (Tr. 441) recommended as had the Stone Commission and Citizens' Committee.

(3) *Relations between staff and children and* (4) *Staff knowledge of the children's problems*:

The adequacy of relations between members of the staff and the children is a function not only of staff numbers and training, but availability of information about the child, and of communication between staff members who serve a child.

Experts for both parties agreed that a satisfactory and close relationship to an adult (staff) member is critical to the success of any detention center treatment program. As Dr. Greenwood, testifying for the defense, put it (Tr. 431):

"But you see, he [the child] has to go through a process, if you want to call it detoxifying, his parents and finding another adult who believes in him, who sees him as a human being and doesn't say, 'Get the _____ out of here, I don't want you around, you are a nuisance' and so on. He finds some one who says 'Yes, I am interested in you. What can I do to help you?'"

John Wallace, Director of Probation (and a defense witness) agreed that the function of a counsellor [12] is intended to be more than merely custodial—comparable to that of a summer camp counsellor for a camper. He described one of the difficulties in achieving the objective as:

"The thing that we have on kids, and I think we have to look at it, is the kids' perception of the staff members. He's here to see that I ain't down there. And the kid has to get past that point before he starts talking to the counsellor."

When asked whether the child's relationship to the child care worker is an important element in a treatment plan for a child, Dr. Weiner, appearing for the plaintiffs, replied:

"It's probably the crucial element, the most important element of all."

But the evidence established that this "crucial element" was generally not provided. Robert Martarella was at Spofford for six months. When questioned:

"What does the counsellor do. What is his job supposed to be?"

He answered:

"Sit there and make sure you don't try to escape, or he takes you to activities."

Jill Fein (who had been at Spofford and Manida for 10 days) was asked by the court:

"Do you know what the counsellor is supposed to do, what their job is?"

---

12. Throughout this discussion the use of the title "counsellor" refers to a dormitory counsellor who has children in charge regularly and for extended periods, and, not, for example, to "counsellors" who may transport a child to or from court without any continuing relationship or, indeed, any prior acquaintance. .

Her statement was:

"I really don't know except to make sure that the kids don't get into fights, but they do that anyway, so —".

Dr. Rothman (plaintiffs' witness) remarked (Tr. 82) that:

"The children don't feel generally and, of course, there are exceptions, as I say, that they can relate to the people there."

William Ocean, who spent some months at Spofford, presumably was among the exceptions referred to by Dr. Rothman. He reported that he talked to counsellors and other staff members about his complaints, but the positiveness of his testimony was somewhat diluted in the following exchange on direct examination:

"Q Do you recall when you were at Spofford what was your biggest complaint at Spofford?

A I can't recall."

The low ratio of counsellors to children has an inevitable impact on the relationship between them. As Dr. Greenwood put it, the larger the group of children, the "more time [is] devoted to discipline, less time to real activities". (Tr. 430-1)

A further difficulty exists because of poor intra-staff communication of information relating to the children. Paragraph 28B(4) of the complaint alleges that:

"Communication between counsellors, caseworkers, and the educational, recreational, medical and administrative staff exists only at a minimal level, resulting in confusion and a lack of shared useful information which has a detrimental effect on the children."

This allegation is not denied by the Defendants' Answer.

The Stone Commission Report noted the lack of interdepartmental communication or regularly scheduled interdepartmental meetings as well as deficiencies of communications among counsellors themselves (Report p. 40–41).

Another obstacle is the paucity of information which a counsellor receives about a child under his care, as the following exchange indicates: (Tr. 382)

"Q What type of information does each counsellor have about the children on his dormitory? Does he have a full social history of the child who is on his dormitory?

A (By Mr. Wallace) No, he will not have a full social history.

Q Does he have the information that brought him to Family Court, the factual allegations of that petition?

A No, we may not even have it ourselves."

The counsellor is merely informed of any special behavioral problems of the child and, whether he is an escape risk or a fugitive (Tr. 382–383), and although the counsellor may quickly learn from the grapevine the child's reason for being at the center, this is hardly a substitute for a cohesive version of the child's social history, and the facts of the PINS petition against him.

The caseworker's usefulness is similarly limited. There are apparently no regular case conferences between caseworker and counsellor (Tr. 392). Counsellors do not regularly prepare reports on a child; only as to special incidents (Tr. 384). Indeed, according to the Stone Report, communication between a caseworker and a counsellor is often "totally lacking" and "depends solely on the personalities of the individuals involved". (Tr. 50) For reasons of confidentiality, psychiatric reports as to the child are given to a caseworker only upon court order. (Stone Report p. 46). Although caseworkers interview parents, they do so only at a parent's request. (Stone Report p. 47) (Tr. 385) The result of all of these inhibitions is that "Practically all information on a child [secured by a caseworker] must be gleaned through interviewing him", (Stone Report p. 47) a process which, although necessary and useful, is, of course, of limited value because of the ex parte, subjective and possibly immature presentation by the child.

We have already observed on the deficiencies in psychiatric services, acknowledged by the defendants themselves. It is a reasonable inference that the shortage of psychiatric and psychologist manpower prevents the establishment of meaningful relations between such members of the staff and the children, except, perhaps, with the very limited number of persons for whom there is treatment time.

There is no doubt that the recreational and educational activities at the centers are positive and useful ingredients of the program. Indeed without them life would be intolerably dreary, and the sheer residual detention would clearly constitute the cruel and unusual punishment of a status declared unconstitutional by Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Field trips by bus (470 children went in the summer of 1971 (Tr. 341)), presentation of plays, holding of dances (Tr. 217–18), gym, swimming, yard play, baseball, school, TV and cards are all healthy and useful activities—activities which are also provided in many an adult prison. But neither individually nor collectively do they fulfill society's promise and obligation to non-criminal children of a right to treatment.

*Common Custody of PINS and JDs*

As we have earlier indicated persons in need of supervision—the class of plaintiffs in this case—are not charged with committing crimes. Normally their offenses consist of truancy or running away from home. In contrast, Juvenile Delinquents are charged with acts (ranging from minor offenses such as petty larceny to major offenses such as rape and murder) which, if committed by an adult, would be criminal. Yet when a PINS is held in temporary secure detention, he is held in the same institution as a JD. While there is no dispute as to this fundamental fact, there is sharp dispute as to the effect on the child of such common custody, and as to whether the common custody is rationally justified and professionally acceptable.

The statute (Family Court Act § 739), of course, authorizes such custody; but by regulation (18 N.Y.C.R.R. 9.5), neglected, abandoned and destitute children may not be confined in secure detention with JDs. The plaintiffs contend that this distinction between the custodial treatment of a PINS and a neglected child, neither of whom is accused of crime, is an arbitrary classification which violates the Equal Protection clause. The defendants respond that the distinction between the custody arrangements for PINS and neglected children is reasonable, and that the Equal Protection clause does not require that PINS and neglected children be treated identically.

The divergence of the expert testimony and what conclusions are to be drawn from it are illustrated by the following recapitulation:

Dr. Rothman testified (Tr. 79) that it was "very damaging" for girl PINS to be housed with girl JDs, because the atmosphere causes girls to boast about their criminal exploits so that such acts become a matter of "honor, prestige, and it gives them a whole set of values going in another direction, of course, of which we disapprove". This view was shared by Mel Rivers (Tr. 48) who stated:

"Well, based on my own experience, if I can use that as a design, in most institutions, one of the ways of surviving, be it a juvenile or an adult, is the politics called for, talking about the crimes that you committed is part of this life style. You boast about these things because it is almost like a badge of honor to be able to say that you stole a car or to be able to say that you snatched a pocketbook or you shoplifted, and to take this and just blow it up to its highest point. . ."

Martarella himself testified that while at Spofford "They tried to teach me how to rob a pocketbook. They tried to teach me how to rob a car." (Tr. 21)

Rivers pointed out another danger of mixed PINS and JDs in custody:

"The other thing is that survival belongs to the fittest in institutions, juvenile or adult, and for a person to survive in an institution, regardless of what crime he is there for, he must acclimate himself to being violent. He must know how to fight."

and Dr. Rothman felt that the result of mixing PINS and JDs was that the children generally begin to "like" and "see as a way of life" an "aggressive bullying pattern".

Even defendants' witness, Dr. Greenwood agreed that it would be "desirable" to provide a facility for PINS separate from JDs. Dr. Greenwood agreed, also, that at least in some cases, as a result of the so-called "labelling" process, PINS would begin to think of themselves as JDs because of being detained in the same institution as JDs.

On the other hand, from the testimony of Judge Florence Kelley, Administrative Judge of the Family Court, a defense witness, and Dr. Weiner, for the plaintiffs, it is plain that private institutions regularly co-mingle PINS and JDs in custody. (Tr. 290–1, 177)

It was Judge Kelley's view that the children should be separated "in terms of what treatment they needed, not on the basis of PINS and delinquency, but in terms of their problem and the treatment that is required by their problem". As she put it:

"I mean, some people think a person in need of supervision is somebody just staying away from school. Well, this simply does not describe a person in need of supervision. I think some of our most seriously disturbed children are the ones who come in as alleged persons in need of supervision." (Tr. 290)

Furthermore, it is important to note that the distinction between a PINS and JD is often factually less clear cut than the labels would suggest. Petitions alleging juvenile delinquency are quite regularly changed to petitions alleging a need of supervision by the Family Court judges on motion of the child's law guardian. The process appears analagous to reducing charges in an adult criminal court. Judge Kelley explained the reasons for such a procedure which, she said, "happens every day", and her testimony illustrated the interchangeable character of PINS and JDs in at least a significant number of cases (Tr. 289):

"There are times when in certain situations it seems meaningless. If a child is brought in on an allegation of juvenile delinquent, really what you are talking about is one specific act on the part of the child. A person in need of supervision you are generally talking about a kind of behavior which must involve more than one incident.

"Now, when you get further into the case and know more about the child you as the judge may realize that the basic problem that will have to be dealt with in treating the child will be behavior rather than what motivated him to do that one exact act.

"But also you may find that the behavioral thing will yield to treatment rather than just dealing with one act, and you would change it then."

Dr. Rothman, a witness on whom the defendants relied heavily, agreed that there are not "significant personality differences between people who are adjudged PINS and people who are adjudged JDs" (Tr. 85–86). Indeed, the named plaintiff Martarella, for example, had stolen money from his parents more than once before he was sent to Spofford as a PINS (Tr. 39).

Dr. Greenwood (for the defense) supported the view that the labels PINS and JDs are not the basis upon which it should be determined whether children should be held in common custody. Although, as earlier indicated he felt it would be "desirable" to have a separate PINS facility, he, nevertheless, controverted the view that PINS would be "contaminated" by being housed with JDs, observing that "all kids select the

things they want to imitate". (Tr. 449) Dr. Schulman (also a defense witness) did not believe there was any good reason for separating the categories. He disagreed that being in common custody with JDs would orient the PINS child in the direction of criminal activity, and felt that the secure nature of the situation "may neutralize the effect that the JDs may have on the PINS, or the other way around, the PINS may have a positive influence on the JDs" (Tr. 234–5).[13]

Plaintiffs' Equal Protection argument that PINS should not be housed with JDs is based on the rationale that since the law prohibits the common custody of neglected children (who have committed no crimes) with JDs, it must similarly prohibit the common custody of PINS (who have committed no crimes) with JDs. Defense witnesses disagreed with the underlying assumption that the same rule should apply to PINS as neglected children merely because neither category involves criminal activity.

Judge Kelley pointed out (Tr. 304 ff) that in the case of a PINS the child himself is charged with misbehavior, albeit non-criminal, while in the case of a neglect petition the charge is against the parent, and the parent is alleged to be the cause of child's misbehavior, if any.

While the housing arrangements and program for a child at the center are not determined on the basis of whether the child is a PINS or a JD, the authorities are in the process of developing standards of classification by which it will be determined how the child is to be placed and treated within the institution.

Identical interrogatories were put to Commissioner Sugarman of the Department of Social Services, and to Wayne Mucci, Director of Operations, Bureau of Institutions & Facilities of that Department. From their answers the facts appear as follows:

Presently [14] no distinction is made between PINS and JDs with respect to treatment afforded,[15] sleeping arrangements, recreation or schooling. However, the Bureau is "just now" developing a system of classification based on the nature of the child's problem rather than his status as a PINS or JD. A team of social worker, counsellor, teacher, psychiatrist and physician will observe and evaluate each child for placement. Thereafter, the child will be housed on the basis of age, maturity, emotional development, emotional and psychiatric history (when available), the charge against him or her, and evidence, if any, of drug use, but without regard to whether the child is charged as a PINS or JD (Interrogatory 26). Children who are charged with committing rape or murder will be separated from other children "whenever necessary", the criteria for such separation again including, in addition to the charge itself, age, maturity and psychiatric history and evaluation. (Interrogatory 31) A separate dormitory and program for treatment has been set up for drug users for boys at Spofford,[16] although entry into the dormitory is on a voluntary basis. (Interrogatory 32)

In sum the evidence establishes that PINS and JDs are not separately treated

---

13. Of course, the possibility that PINS might exert a favorable influence on JDs is hardly a justification for holding PINS together with JDs, if the latter exert a malevolent influence on the PINS.

14. July 13th, 1972.

15. John A. Wallace, Director of the Office of Probation, which administered the centers at the time the suit was brought stated (answer to Interrogatory 27 addressed to him) that at that time "The basis for working with children [at the centers] is the behavior pattern of the child, not the labels of PINS or juvenile

delinquents. A distinction is not made between alleged or adjudicated juvenile delinquents and PINS children with regard to sleeping arrangements, recreation or schooling." The system of classification was then less refined than that referred to in Commissioner Sugarman's and Mr. Mucci's answers, and the team evaluation does not appear to have been made.

16. The answers to the interrogatories do not indicate whether similar arrangements have been made at the girls' centers.

or housed on the basis of their "labels", but on a set of criteria which relate to the problems, offense and personality of each child.

*Questions of Law*

Before dealing with the substantive issues presented, it is necessary to dispose of defendants' contentions (1) that the court lacks jurisdiction and (2) that in any event the case should not be declared a class action.

1. *Jurisdiction*: only peripherally and en passant the defendants suggest that the court lacks subject matter jurisdiction and personal jurisdiction of the judicial defendants. Point I of their Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief reads, "Detention of a Youth Adjudicated a Person in Need of Supervision Does Not Violate the Eighth Amendment and Does Not Provide a Basis for Federal Jurisdiction—", and the defendants have moved to dismiss for lack of jurisdiction.

Three questions arise: (a) Does the subject matter itself confer jurisdiction? (b) Are the judicial defendants "persons" within the meaning of 42 U.S.C. § 1983? (c) Are the judicial defendants immune from suit qua judges?

■ (a) Apparently confusing the concept of abstention, and the question of the extent to which Federal Courts should intervene in the administration of state custodial institutions, with the issue of jurisdiction the defendants claim, citing Wright v. McMann, 387 F.2d 519, 2d Cir. 1967, (Memorandum in Opposition to Motion for Preliminary Relief p. 23) that "The Second Circuit has made clear that only barbarous or atrocious circumstances may form a basis for federal jurisdiction". But this statement is a complete misreading of *McMann*, which to the contrary clearly affirmed the *jurisdiction* of Federal Courts to entertain § 1983 suits relating to the conditions of custody and held that they should not *abstain* from deciding such cases, but did place limits on the extent to which the Federal Courts should *intervene* in the administration

of the custodial institutions. *McMann* and the plethora of similar civil rights suits both before and since *McMann* entertained by the Federal Courts—too numerous to require citation—clearly establish Federal jurisdiction of the subject matter: The constitutionality of conditions of custody.

■■ (b) The question whether state or municipal judges are "persons" within the meaning of 42 U.S.C. § 1983 may not be altogether settled. In Zuckerman v. Appellate Division, 421 F.2d 625 (2d Cir. 1970), the Court of Appeals held that a civil rights action could not be maintained against the Appellate Division as a body, because it is not a "person" within the meaning of § 1983. However, in Erdmann v. Stevens, 458 F.2d 1205, 2d Cir. 1972, the Court of Appeals held that a § 1983 suit could properly be brought against the Justices of the Appellate Division sued as individuals, as in the instant suit. In reaching its conclusion, the *Erdmann* court relied on the reasoning of Chief Judge Friendly in Law Students Civil Rights Research Council Inc. v. Wadmond, 299 F.Supp. 117 (S.D.N.Y. 1969; Three Judge Court; aff'd on other grounds 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749, 1971) that no sound reason exists for holding that Federal Courts should not have power to issue injunctive relief against the commission of acts in violation of a plaintiff's civil rights by state judges acting in their official capacity (458 F.2d at 120 and 299 F. Supp. at 123).

We agree with the views expressed in *Erdmann*, which is the most recent statement of the Court of Appeals on the subject.

(c) The judicial defendants are not immune from suit, since the sole relief requested by the plaintiffs here is declaratory and injunctive. Of course, a judge exercising his official function may not be held liable for damages under 42 U.S.C. § 1983. Pierson v. Ray, 386 U.S. 547, 553–555, 87 S.Ct. 1213, 18 L. Ed.2d 288 (1967), but since Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908), it has been settled that

if officers administering a state statute act in a manner that exceeds constitutional limits they have no claim to sovereign immunity, judicial or otherwise. Judge Friendly's opinion in *Law Students Civil Rights Research Council Inc.*, *supra*, makes it clear that where, as here, the relief sought under § 1983 is solely of a declaratory and injunctive nature, the principle of immunity does not apply.

Accordingly, we conclude that the court has subject matter jurisdiction and jurisdiction of the person of the judicial defendants.

■ 2. *The Propriety of a Class Action*: In opposing plaintiffs' request that the case be declared a class action, defendants argue (Point II, Memorandum in Opposition to Motion for Preliminary Relief) that the plaintiffs do not represent a class as defined in Rule 23, Fed.R. Civ.Pr. because the placement of each child involves different factors and circumstances. While we may agree, arguendo, that the determination of where and whether each child brought before the Family Court should be remanded pending disposition of his case is necessarily an "individual" decision, the proposition misses the point.

Plaintiffs do not challenge the power of the Family Court to determine where and whether each of them should be remanded. What they attack as unconstitutional is their detention in secure custody without, as they claim, treatment, under conditions amounting to cruel and unusual punishment and in the same facilities as juvenile delinquents. These claims are obviously common to the named plaintiffs and to all PINS housed at the centers.

The commonality of the claims being established,—there could be no clearer example of a class suit—analogous as it is to the host of prisoners' suits which the courts have recently entertained as class suits.

The requirements of Rule 23(a) and 23(b)(2) are clearly met. The class of about 200 members is sufficiently numerous that joinder is impracticable, the questions of law and fact are clearly common to the class; the plaintiffs' claims are typical—if not identical—with those of the class; the representative parties have demonstrated already that they fairly and adequately represent the class; and (Rule 23(b)(2)) the parties opposing the class have acted or refused to act on grounds generally applicable to the class so that declaratory or injunctive relief is appropriate with respect to the class as a whole.

Accordingly, the case is properly maintained as a class action.

\* \* \*

At the end of a long journey we come to the legal questions raised on the merits of the case.

3. *The Constitutionality of Common Custody of PINS and JDs:* [16a] In arguing that the New York regulations violate the equal protection clause because they prohibit neglected children from being housed with JDs but do not give the same "protection" to PINS, plaintiffs rely on the rationale of Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed. 2d 620 (1969).

In *Baxstrom*, the Court held that it was arbitrary and capricious to deny to a mentally ill prisoner whose sentence

---

16a. The Family Court Act itself as originally enacted in 1962 did not authorize placement of PINS in a maximum security institution (Laws of New York 1962, Chapter 686, § 756(a), at 2301). In 1964, 1965 and 1966 temporary amendments to the Act authorized institutionalization of PINS in the same facilities as JDs—primarily because there was no place else to send them. It was only in 1968 that the Act was permanently amended to permit such common custody. The Com-

monwealth of Massachusetts has recently eliminated all secure custodial institutions and substituted community-oriented programs and other alternative treatment methods that do not involve confinement. For a general discussion of the views supporting the elimination of secure detention see "Non-Delinquent Children in New York: The Need for Alternatives to Institutional Treatment", 8 Columbia Journal of Law and Social Problems 251, 1972.

was about to expire, but who was held for further custody in a hospital under the jurisdiction of the Department of Correction, the procedural protection granted all other persons civilly committed to mental hospitals. "Equal protection", the court stated (at 111, 86 S.Ct. at 763) "does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made."

The question before us is whether the distinction between PINS and neglected children which allows the former, but not the latter, to be held in common custody with JDs has some relevance to the purpose for which the classification is made. We believe that it does.

■ It is true, of course, that a PINS and a neglected child—as distinct from a JD—have in common that neither is charged with acts of a criminal nature; but this fact alone does not require the state to treat PINS and neglected children identically if a rational basis exists for some other mode of action. The rationality demanded by the Equal Protection clause is not to be found in legal designations or labels, but must derive from the facts.

■ From the evidence before us we conclude that the distinction made in the custody and treatment of PINS and neglected children bears a reasonable relation to the purpose for which the classification is made.

A neglected child is defined by § 312 of The Family Court Act:

"A 'neglected child' means a male less than sixteen years of age or a female less than eighteen years of age.

(a) whose parent or other person legally responsible for his care does not adequately supply the child with food, clothing, shelter, education, or medical or surgical care, though financially able or offered financial means to do so; or

(b) who suffers or is likely to suffer serious harm from the improper guardianship, including lack of moral supervision or guidance, of his parents or other person legally responsible for his care and requires the aid of the court; or

(c) who has been abandoned or deserted by his parents or other person legally responsible for his care."

A person in need of supervision is defined by § 712 of the Act:

" 'Person in need of supervision' means a male less than sixteen years of age and a female less than eighteen years of age who is an habitual truant or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent or other lawful authority."

The distinction drawn by the definitions, and the consequent factual difference in the membership of the two classes of children is evident, and forms a clearly rational basis for differences in their conditions of custody. Judge Kelley articulated the distinction clearly: (Tr. 304 ff) a PINS is himself charged with misbehavior; in the case of a neglected child, the parent is the "defendant". Neglected children are victims, PINS are (non-criminal) offenders, or at least socially maladjusted. The neglected child is sinned against rather than sinning. On the other hand, a PINS' personal behavior is the cause of his subjection to legal authority.

While realism compels acknowledgement that the lines are often blurred, and that the PINS' maladjustment is frequently caused by misguidance or mistreatment by parents or other authority (as may be equally true of JDs) the acknowledgement does not vitiate the rationality of the distinction. For these reasons we find no violation of the equal protection clause.

■ We also find the purposes and criteria of the classification system at the centers to be rational and justifiable. While even defense witnesses agreed that it would be "desirable" to establish separate facilities for PINS and JDs, the conflict among experts as to whether

joint custody is damaging to PINS is too sharp to sustain a finding of unconstitutionality either as a matter of due process or cruel and unusual punishment. Clearly the system of classification in effect at the time of trial, and its improved sequel, do not violate professional standards for the care of PINS and JDs. Of course, there is considerable debate within the child care profession as to whether PINS should be held in secure detention under *any* circumstances, and clearly they may not be so detained unless treatment is provided, but those questions are separate.

It is significant that among the otherwise divided experts there was virtual unanimity that no child—PINS or otherwise—should be treated according to his label, but rather according to his personal need. As Dr. Rothman, defendants' key witness and the witness most knowledgeable about the actualities at the centers, stated: "There are no significant personality differences between people who are adjudged PINS and people who are adjudged JDs" (Tr. 85–6).

The system in effect which classifies the child according to his age, maturity, emotional development, emotional and psychiatric history, the charge against him or her, and evidence if any, of drug use (Sugarman and Mucci responses to Interrogatory 26, June 16th and July 13th, 1972), assuming that each factor is given a professionally acceptable weight, is rationally calculated to accomplish the objective approved by all the experts: treatment of the child according to his need rather than his label.

The rationality of the system assures its constitutionality. However, even were this not so and even though we may find more persuasive the view of the

experts who strongly favor separation of PINS and JDs,[17] we are bound by the rule, most recently explicated in Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1971), that:

"Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us *as a federal court* to command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or *personally* repugnant. As judges we are obliged to school ourselves in such objective sources as historical usage, see Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1870), practices in other jurisdictions, see Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and public opinion, see Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), before we may responsibly exercise the power of judicial review to declare a punishment unconstitutional under the Eighth Amendment." (Emphasis in original.)

Nor do we find that common custody of PINS and JDs is unconstitutional on the analogy of those cases such as White v. Reid, 125 F.Supp. 647 (D.D.C.1954) Kautter v. Reid, 183 F.Supp. 352 (D.D.C. 1960) and United States ex rel. Stinnett v. Hegstrom, 178 F.Supp. 17 (D.Conn. 1959), which hold common custody of juvenile offenders and adult criminals to be impermissible. While the analogy is relevant, it is not compelling. *All* experts agree that common custody of juveniles and those who are usually described— whether accurately or not—as "hardened" criminals is damaging to the juvenile, whereas here the schools are sharply divided. Beyond that, however, the

---

17. § 16d of The Uniform Juvenile Court Act drafted by The National Conference of Commissioners on Uniform State Laws (1968) provides that persons in the plaintiff class "shall not be detained in a jail or other facility intended or used for the detention of—children alleged to be delinquent". The Report of the California Assembly Interim Committee on Criminal Procedure, Juvenile Justice Processes (1971) at 14, states that "_____ if any of them [children in the status of the plaintiff class here] were ever on the verge of committing a criminal act, they have been brought to the right place [i. e., joint custody with delinquents] for a final push."

*legal* rationale as to the impermissiblity of common custody of juveniles and adults is normally that the young offender is not classified as a criminal, and, therefore, may not be held in a penal institution jointly with criminals. In the case before us, however, neither a JD (though he has committed an offense which would be criminal if committed by an adult) nor, of course, a PINS is so classified.

Indeed the Court of Appeals of this Circuit appears recently, at least by implication, to have found that custody of juvenile offenders together with adult criminals does not offend the constitution. United States ex rel. Murray v. Owens, et al., 2d Cir., 465 F.2d 289, 1972.

For the reasons stated, we hold that common custody of PINS and JDs does not violate the equal protection clause, due process or the Eighth Amendment.

4. *The Constitutionality of Physical Conditions at the Center*: Plaintiffs contend that the physical conditions at the centers are so hazardous and unhealthy that holding them in custody there constitutes cruel and unusual punishment.

 There is no doubt that the Eighth Amendment's prohibition of cruel and unusual punishment is not restricted to instances of particular punishment inflicted on a given individual but also applies to mere confinement to an institution which is "characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people". Holt v. Sarver, 309 F. Supp. 362, 373 (E.D.Ark.1970). See also Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio W.D.1971) and Rhem v. McGrath, 326 F.Supp. 681 (S.D.N.Y.1971). Plaintiffs argue that conditions at the centers fall within the parameters of those decisions and violate the Eighth Amendment.

 Since the trial of the case Zerega has been closed, and the claim as to it is, therefore, moot. We find the remaining contentions to have merit as to Manida but not as to Spofford.

As we have indicated in the factual discussion, Manida was constructed in 1904, and is in a general state of decay; its plaster falling, paint peeling, and cracks in walls and ceilings. Showers have often been in such disrepair that they were unuseable. The Stone Commission Report criticized its gymnasium as "merely a medium-sized dilapidated room with two large poles in the center which restrict any mobile activity." It stated that a HEW expert consultant in 1963, submitted a report to the Director of the Centers in which he concluded that Manida was unsuitable for the detention of children, and that the condition had not been improved. Indeed the defendants have stipulated that Manida is an inappropriate facility for child detention. John Wallace, Director of Probation, who had jurisdiction of the centers at the time of trial agreed, as did Judge Kelley (Tr. 325), with the Stone Commission recommendation (Recommendation No. 7), that "The Manida and Zerega facilities should be replaced", and the Citizens' Committee report stated (p. 5) that "All the buildings now used for detention purposes should be closed or converted to other uses with reasonable speed". The Department of Social Services, which now has jurisdiction of the centers "hopes" to close Manida by May 1973 (Mucci answers to Interrogatories 1 and 3, July 13th, 1972).

The word "unsuitable" is a euphemism for conditions that in their totality violate the Eighth Amendment rights of the young girls who are held in custody at Manida although not even charged with crime.

The situation is different at Spofford. With all its drawbacks, including its architectural resemblance to a small prison of modern construction, Spofford is a relatively contemporary building (built in 1958) whose physical conditions, although they should be improved, are acceptable and, at the least, correctable. None of the deficiencies at Spofford can reasonably be classified as hazardous. The Stone Report stated (p. 31) that Spofford "does not appear to be in such

condition as to represent a physical danger to its occupants and thereby require immediate replacement—" and it includes positive advantages, such as school rooms, game rooms, room for religious services, gymnasium, swimming pool and an outdoor playing yard.

While we do not adhere to the view that the Eighth Amendment comes into play only if the facility in question is a chambers of horrors, we do not find that the physical conditions alone at Spofford are such that confinement there constitutes cruel and unusual punishment.

■ 5. *Does the Program at the Centers Provide Treatment which Constitutionally Justifies Holding PINS in Secure Detention*: We come to the final and most difficult legal issue in this case, which has poignantly presented questions of the rights of children in urban American society: The right to treatment.

To give the analysis focus, historic perspective is necessary. As one commentator has put it:

"Our society has increasingly divested certain groups from the traditional criminal justice court and, acting under its asserted role of *parens patriae,* substituted new therapeutic controls. The most dramatic example of this divestment has been in the treatment of offending juveniles, where the arrested juvenile is subjected not to the sanctions of the criminal tribunals, but to the disposition of the juvenile courts. The latter, at least purportedly, do not dispense criminal justice; instead their function is to offer the offending juvenile regenerative treatment." [18]

Although the concept of the right to "effective treatment" [19] was first articulated not much more than a decade ago,[20] it has come into nearly full flower in the intervening period, and has been applied to the mentally ill, sexual psychopaths, defective delinquents, persons committed following acquittal by reason of insanity, drug addicts and children, whether delinquent or merely in need of supervision.[21]

Even before the development of the doctrine of the right to treatment for all persons held in noncriminal custody, the courts asserted an analogous right for children derived from due process concepts and statutes. See, e. g., White v. Reid, 125 F.Supp. 647 (D.D.C.1954), which held that a juvenile not convicted of a crime could not be held with criminals in a federal jail; and Kautter v. Reid, 183 F.Supp. 352 (D.D.C.1960) ruling that a juvenile who had violated pa-

18. Kittrie: "Can the Right to Treatment Remedy the Ills of the Juvenile Process". In "A Symposium The Right to Treatment" 57 Georgetown Law Journal, 848, 851-2 (1969). In connection with Kittrie's use of the term "regenerative", it is significant to note that the class of children before us is almost exclusively disadvantaged and poor. While the evidence presented did not focus on this fact, it is apparent from the record that children adjudicated as persons in need of supervision come from poor families, who do not have available to them the better schooling, financial resources, superior opportunities for recreation, more intelligent parental guidance, easier access to psychiatric treatment, deeper roots in the society, and reluctance of parents, not so desperate or untutored, to press charges against a child. It is reasonable to assume that the requirements of "regenerative treatment" for disadvantaged and poor children is greater than that for oth-

ers. In any event, the status of the plaintiff class here emphasizes the need for scrutiny of the standards of treatment furnished at the centers.

19. Gough: "The Beyond-Control Child and The Right to Treatment: An Exercise in the Synthesis of Paradox", 16, St. Louis University Law Journal 182, 1971.

20. Birnbaum: The Right to Treatment, 46 A.B.A.J. 499 (1960). The same issue contained an editorial entitled "A New Right" which discussed the right to treatment.

21. Civil Restraint, Mental Illness and The Right to Treatment, 77 Yale Law Journal 87, 1967. While this article deals with the right to treatment of the mentally ill, it illustrates the rapid expansion of the doctrine of right to treatment in general between 1960 and 1967. See, also, The Nascent Right to Treatment 53, Virginia Law Review, 1134.

role could not be held in a jail which lacked particular and adequate facilities for children.

There can be no doubt that the right to treatment, generally, for those held in non-criminal custody (whether based on due process, equal protection or the Eighth Amendment, or a combination of them) has by now been recognized by the Supreme Court, the lower federal courts and the courts of New York.

Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) dealt with the rights of a drug addict plaintiff. The court held California's statute, which declared addiction a crime, unconstitutional in the absence of rehabilitative treatment. This was punishment for a *status*, rather than a crime; and although the State might legally detain non-criminals for compulsory treatment or other legitimate purposes which protected society or the person in custody, detention for mere illness—without a curative program—would be impermissible. "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold"— *Robinson, supra* at 667, 82 S.Ct. at 1421. Although other recent Supreme Court decisions which have dealt in depth with the rights of children, such as In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967), Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) and In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), have not focused on the right to treatment, they have indicated markedly increased solicitude for the constitutional rights of children. *Gault* touches on the right to treatment *en passant*, but with great significance: (at Footnote 30)

"While we are concerned only with procedure before the juvenile court in this case, it should be noted that to the extent that the special procedures for juveniles are thought to be justified by the special consideration and treatment afforded them, there is reason to doubt that juveniles always receive the benefits of such a *quid pro quo* . . . The high rate of juvenile recidivism casts some doubt upon the adequacy of treatment afforded juveniles. . .

In fact some courts have recently indicated that appropriate treatment is essential to the validity of juvenile custody, and therefore that a juvenile may challenge the validity of his custody on the ground that he is not in fact receiving any special treatment". (Citations omitted).

It is interesting to note that one of the reports referred to in the preceding quotation as constituting a "reason to doubt that juveniles always receive the benefits of such a *quid pro quo*" is In the Matter of Youth House, Inc. (now the juvenile center in this case) Report of the July 1966 "A" Term of the Bronx County Grand Jury, reported in The New York Times March 23rd, 1967.

Judge Bazelon's seminal opinion in Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, 1966, dealt more directly with the issue of the right to treatment, and is generally regarded as the leading case. *Rouse* was involuntarily hospitalized in a mental hospital after having been acquitted of a misdemeanor by reason of insanity. He petitioned for a writ of habeas corpus, claiming the right to be discharged in the absence of receiving treatment. The court sustained his argument on statutory grounds but with considerable emphasis on the constitutional questions raised, observing that:

"absent treatment, the hospital is transform[ed] . . . into a penitentiary where one could be held indefinitely for no convicted offense, . . .". (at 453)

The opinion (at 453) emphasized issues of due process, but suggested the equal protection clause and the Eighth Amendment, citing Robinson v. California, *supra*, as other constitutional foundations for the right to treatment.

Prior to *Rouse*, in Sas v. State of Maryland, 334 F.2d 506, 4th Cir., 1964, the court had recognized analogous rights under Maryland's defective delinquent statute, observing (at 517) that

"[d]eficiencies in staff, facilities, and finances would undermine \* \* \* \* the justification for the law, and ultimately the constitutionality of its application".

Haziel v. United States, 131 U.S.App. D.C. 298, 404 F.2d 1275, 1968, emphasized the points made by earlier cases, and stressed the particular obligation of the community to provide treatment for detainees who cannot afford it. As the court observed (at 1280):

" . . . we also cannot ignore the mockery of a benevolent statute unbacked by adequate facilities. And to the extent that a juvenile with more affluent parents might avoid waiver [i. e. custody] because of the availability of privately-financed treatment and rehabilitation, constitutional issues may lurk in the problem."

In Wyatt v. Stickney, 325 F.Supp. 781 N.D.Ala.1971), Chief Judge Johnson strongly affirmed the right of treatment for persons in non-criminal custody and held that hospital programs for the mentally ill in the case before him were *constitutionally* inadequate. In following Rouse v. Cameron, *supra,* he declared:

"To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." (at 785)

New York judges (including defendants here) have been equally alert to sustain the right to treatment, as indicated in "Anonymous" v. (People) Fish (v. Horn), 20 A.D.2d 395, 247 N.Y.S.2d 323 (1st Dept. 1964) (PINS are entitled to rehabilatory treatment and not to be committed to penal institutions); People ex rel. Kaganovitch v. Wilkins, 23 A.D.2d 178, 259 N.Y.S.2d 462 (4th Dept. 1965) (Retaining sex offender in custody in spite of absolute failure to provide treatment is cruel and unusual punishment); People ex rel. Meltsner v. Follette, 32 A.D.2d 389, 302 N.Y.S.2d 624 (2nd Dept. 1969) (youthful offender confined beyond maximum term to which he would have been sentenced as an adult must be furnished rehabilatory treatment); In re I, 64 Misc.2d 878, 316 N.Y.S.2d 356, 1970, (facility's refusal or inability to provide psychiatric care for a 15 year old girl PINS required the court to terminate her placement and release her on probation), and Matter of Lloyd, 33 A.D.2d 385, 308 N.Y.S.2d 419 (1st Dept. 1970) (declaring the Legislature's obligation to make available the facilities necessary to provide treatment for the non-criminally detained).

To these citations may be added a significant number of decisions of courts outside New York which have also sustained the right to treatment.[22]

In sum, the law has developed to a point which justifies the assertion that:

"A new concept of substantive due process is evolving in the therapeutic realm. This concept is founded upon a recognition of the concurrency between the state's exercise of sanctioning powers and its assumption of the duties of social responsibility. Its implication is that effective treatment must be the *quid pro quo* for society's right to exercise its *parens patriae* controls. Whether specifically recognized by statutory enactment or implicitly derived from the constitutional requirements of due process, the right to treatment exists." [23]

We move on, then, to determining the criteria by which the court should measure the centers' programs to deter-

---

22. For a useful summary of the cases, see Gough, "The Beyond-Control Child" supra, at its footnotes 9–15 inclusive and at pp. 865ff.

23. Kittrie, supra, note 18, at 870. A right to treatment is, of course, recognized by statute in many states (See Footnote 21, Rouse v. Cameron, *supra* at 455) including, for example, New York Mental Hygiene Law, McKinney's Consol.Laws c. 27 § 86.

mine whether they furnish "regenerative" or "effective" treatment. The decisions and literature on this difficult point are considerably less numerous and voluminous than on the subject of the right iself. Nevertheless, the courts and commentators have made at least exploratory efforts towards the formulation of such standards.

We start with the observations of Judge Bazelon in *Rouse* that: (1) The institution need not demonstrate that its treatment program will cure or improve, but only that there is "a bona fide effort to do so", (2) The effort must be to provide treatment adequate in light of present knowledge, (3) the fact that science has not reached finality of judgment as the most effective therapy cannot relieve the court of its duty to render an informed decision and (4) continued failure to provide suitable adequate treatment cannot be justified by lack of staff or facilities, since, as the Supreme Court stated in Watson v. City of Memphis, 373 U.S. 526, 533, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529 (1963), "The rights here asserted are, like all such , rights, *present* rights; . . . and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled."

Some suggestions of the American Psychiatric Association's "Position Statement on the Question of Adequacy of Treatment" (123 Am.J.Psychiatry 1458, (1967), considered and criticized in Civil Restraint, Mental Illness and The Right to Treatment, 77 Yale Law Journal 87 at 110ff) are relevant and useful. They include (1) the purpose of institutionalization, and reference to the length of custody, (2) the importance of interrupting the "disease process" as in separating the addict from his drugs or the psychotic from his family stress situation, (3) efforts to change the emotional climate around the "patient" and (4) the availability of conventional psychological therapies.

The Commentator in "Mental Illness," *supra*, at pp. 112ff, concurs with Judge Bazelon that courts should not determine adequacy of treatment by "forcing the psychiatric professional toward an ideal but unrealizable system, but that bona fide treatment be made available."

We accept this view as sound. Measured by this limiting standard we find that the treatment of children who stay at the centers for a truly temporary period may be minimally acceptable. However, in the light of the solemn meaning which the phrase "bona fide" has acquired through the ages we find that there has not been a bona fide effort to treat the child who is a long termer at the centers, nor is the treatment of such a child adequate in the light of present knowledge. Even those defense witnesses who approved the secure detention of PINS, described as the justification for such detention, treatment programs and facilities vastly superior to those which prevail at the centers. Without attempting to delineate in detail the differences between those institutions and the centers, we emphasize the substantial differences in ratio of professional personnel to children and in the training of counsellors, case-workers and other supporting personnel. The conclusion is inescapable that the shortage of key staff members at the centers, their lack of training, the poor communication among them, the shortage of information available about the child to those who treat him, and the other deficiencies noted in the discussion of facts above, results in a failure to provide adequate treatment for the long term detainee.

The distinction in measuring the adequacy of treatment for true temporary detainees, on one hand, and long termers on the other, is justified by the facts and the law. It is a reasonable inference that factually a treatment program for a temporary detainee need not provide in depth what is necessary for adequate treatment of the long termer, or, put another way, the child who is truly temporarily detained does not suffer deprivation of constitutional

proportions, while the long termers do. We recognize the dangers of all generalizations, this one included, as well as the difficulty of estimating the magic moment at which the deprivation becomes unacceptable—an estimate which can best be made by the parties themselves, with expert assistance if necessary.[24] But the difficulty of the issue does not eliminate the necessity for all concerned, including the court, to find a handle to the problem.

There is legal support for the dichotomy between the rights of short and long termers. The relevance of time as a factor in measuring constitutional rights has been very recently recognized in another context by the Supreme Court. In Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the court held that an untried defendant who had been committed as incompetent to stand trial could only be held for a reasonable period to determine whether he might attain competency within the foreseeable future, and that it was a violation of due process to hold him indefinitely. The court observed at 738, 92 S.Ct. at 1858, in words relevant here, that

> "At the least, due process requires that the *nature* and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." (Emphasis added)

In McNeil v. Director Patuxent Institution, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), the petitioner was held for an indefinite period for "observation". Rejecting the state's argument that the custody was constitutional, the court stated, that: (in Jackson, *supra)*

"We held that because the commitment was permanent in its *practical effect,* it required safeguards commensurate with a long-term commitment." (At 249, 92 S.Ct. at 2087; emphasis added)

The decision continued:

> "If the commitment is properly regarded as a short-term confinement with a limited purpose, as the State suggests, then lesser safeguards may be appropriate, but by the same token, the duration of the confinement must be strictly limited."

The Court of Appeals for the District of Columbia has applied a similar rationale to the subject at hand, holding in Creek v. Stone, 126 U.S.App.D.C. 329, 379 F.2d 106, 111 (1967), that while interim custody may not necessitate the extensive therapeutic program involved in a final disposition, some attempt must be made to relate the detention to the needs of the juvenile.[25]

We recognize the danger that in deciding these issues the court may be "tempted to act as super-legislature and super-executive" (*Kittrie, supra,* at 876), but that risk lies in the realm of remedy rather than analysis. In any event, we agree with the *Rouse* court that the difficulties of decision " . . . cannot relieve the court of its duty to render an informed decision".

It is the job of courts to decide issues. This is particularly true when we are dealing with the rights of children growing up in the difficult conditions of modern urban life.

\* \* \*

---

24. The Citizens' Committee report recommended (p. 3) that "Children who have been detained for 30 days should be in special programs devised for their needs."

25. As indicated in the text above, the American Psychiatric Association's "Position Statement on the Question of Adequacy of Treatment" also specifies the differences between long and short term treatment as a factor in determining adequacy of treatment.

REMEDY

We conclude that plaintiffs are entitled to a declaration that the conditions existing at Manida violate the Eighth Amendment, and that the program at the centers does not furnish adequate treatment for children who are not true temporary detainees, and thereby violated their right to due process. There remains for determination the sensitive and complex matter of the scope of injunctive relief.

In a case of public import involving novel and delicate issues, in which developments in the very subject matter have occurred in the period between trial and decision, injunctive relief should be fashioned with deliberation. The timing of the closing of public facilities, the alteration of the programs for long termers, and determination of an acceptable definition distinguishing short and long termers are matters on which the court should not issue a decree without the considered guidance of the parties.

To conclude: The court has jurisdiction of the subject matter and of the person as to all defendants; the case is properly maintained as a class action; plaintiffs' prayer for a declaration that the physical conditions at the centers violates the constitutional rights of the class is granted as to Manida, but denied as to Spofford, and denied as to Zerega as moot; plaintiffs' claim that holding them and their class in joint custody with juvenile delinquents violates the constitution is denied; plaintiffs' claim that their rights and the rights of the members of the class are violated because they are held in secure detention without effective treatment is granted as to those members of the class actually held in long term detention at the centers, and is otherwise denied. The parties are instructed to prepare for a conference to determine the scope and contents of injunctive relief.

It is so ordered.