*15 OPINION OF THE COURT
Stanley Gartenstein, J.
The court is here presented with a constitutional challenge to CPL 340.40 (subd 7) which denies trial by jury to a youth who is eligible for mandatory youthful offender treatment at the same time this right is available to any other defendant, a discretionary youthful offender included, who is charged with the same crime.
This issue with which we are squarely presented has been raised in some form at almost every stage of the evolutionary process wherein this State has created in gradual phases the byzantine patchwork of statutes differentiating treatment of persons accused of crimes by virtue of age. Because the State of New York has never faced up to its responsibility of enacting a comprehensive scheme delineating separate handling of offenders because of age, the court finds itself in the same position as law enforcement officers, prosecutors, defense counsel and citizens at large all of whom are staggered by the confusion they face in comprehending these laws. We thus find ourselves in the unenviable position of being compelled to strike down a constitutionally offensive statute which is but an infinitesimal part of this maze. We do so fully aware that the impact of this action will be virtually nil on the amorphous web which now passes for this State’s lip service to the noble ideals of rehabilitating human beings under a disability because of age and lack of discretion.
the facts
Defendant Darry P., age 16, is charged with petit larceny (Penal Law, § 155.25) and criminal possession of stolen property (Penal Law, § 165.40) both arising out of an alleged pocketbook snatch on May 1, 1978. He was arraigned the next day and held in bail pending a hearing which was held on May 18, 1978. Both charges are class A misdemeanors carrying a maximum penalty for nonyouthful offenders of one year’s incarceration. Inasmuch as this 16-year-old defendant has never been convicted of a crime or found to be a youthful offender, he is eligible for mandatory adjudication as a youthful offender carrying a maximum penalty of six months’ incarceration. In this instance, because he must be accorded this mandatory adjudication, the statute requires a single Judge trial without a jury. Had the defendant already once been adjudicated a youthful offender thus placing his being treated as such on this occasion within the court’s discretion, he would be entitled to trial by jury.
*16 Defendant now challenges the constitutionality of the statute depriving him of a jury trial. In being presented with this issue, the court has caused notice to be served upon the Attorney-General of the State of New York (CPLR 1012, subd [b]) who has elected not to appear.
CONSTITUTIONALITY — PROVINCE OF TRIAL COURT
It has been long settled in New York that an enactment of the Legislature is presumed constitutional and will be struck down only when its "unconstitutionality is shown beyond a reasonable doubt”. (Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541; accord Nettleton Co. v Diamond, 27 NY2d 182, app dsmd sub nom. Reptile Prods. Assn. v Diamond, 401 US 969.)
The limited power of trial courts to strike down a State statute as unconstitutional has been stated repeatedly. The court, in People v Estrada (80 Misc 2d 608, 610) stated: " 'Particularly, courts of first instance should not exercise transcendent power of declaring an act of the Legislature unconstitutional except in rare cases where life and liberty is involved and the invalidity of the act is apparent on its face’ (National Psychological Assn. v University of the State of N. Y., 18 Misc 2d 722, 725, 726, affd. 10 A D 2d 688, affd. 8 N Y 2d 197, app. dsmd. 365 U. S. 298). Courts of original jurisdiction should not set aside a statute as unconstitutional unless that conclusion is inescapable. (People v Elkin, 196 Misc. 188; Bolhing v Corsi, 204 Misc. 788, affd. 306 N. Y. 815.) The tendency is to leave such questions to appellate tribunals (City of New Rochelle v Ecko Bay Waterfront Corp., 182 Misc. 176, affd. 268 App. Div. 182, affd. 194 N. Y.).” (People v Lofton, 81 Misc 2d 572; Dunbar v Dunbar, 80 Misc 2d 744.)
As we pointed out in Matter of J. R. (87 Misc 2d 900), it is clear that while trial courts are thus enjoined from reaching for an issue of constitutionality, or from considering it when any other basis exists, that when unavoidably confronted with the issue, they are morally and legally bound to consider it and rule accordingly.
The subject of any court’s consideration of constitutionality under circumstances where a "leap” in judicial reasoning is required because authority on which to rest a ruling is not as well defined as one might prefer has been discussed by many legal scholars. Perhaps the most perceptive analysis thereof may be found in Mr. Justice Cardozo’s The Nature of the Judicial Process in which he quotes the French Civil Code (p *17 135, n 53): "The judge who shall refuse to give judgment under pretext of the silence, of the obscurity, or of the inadequacy of the law, shall be subject to prosecution as guilty of a denial of justice.”
Justice Cardozo argues that any declaration of unconstitutionality must of necessity involve a process to which he refers as judicial legislation attributable to the fact that such issues are inevitably found in unchartered waters and involve considerations of social values: "Law never is”, he states (p 126), "but is always about to be”.
In his attempt to define his own mental processes as a guide to lawyers and Judges to follow him, he states (pp 166-167): "As the years have gone by, and as I have reflected more and more upon the nature of the judicial process, I have become reconciled to the uncertainty, because I have grown to see it as inevitable. I have grown to see that the process in its highest reaches is not discovery, but creation; and that the doubts and misgivings, the hopes and fears, are part of the travail of mind, the pangs of death and the pangs of birth, in which principles that have served their day expire, and new principles are born.”
In summarizing, Mr. Justice Cardozo quotes from the writings of two legal philosophers, the first, Mr. Justice Holmes writing in the Harvard Law Review (vol 10, p 467 [quoted in The Nature of the Judicial Process, pp 118-119]: "I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, and the result of the often proclaimed judicial aversion to deal with such considerations is simply to leave the very ground and foundation of judgments inarticulate, and often unconscious”.
And the second, Arthur L. Corbin, writing in the Yale Law Journal (vol 29, pp 771-772) (quoted in The Nature of the Judicial Process, p 135): "It is the function of our courts to keep the doctrines up to date with the mores by continual restatement and by giving them a continually new content. This is judicial legislation, and the judge legislates at his peril. Nevertheless, it is the necessity and duty of such legislation that gives to judicial office its highest honor; and no brave and honest judge shirks the duty or fears the peril.”
We find ourselves in a position of being morally unable to back away from a declaration of unconstitutionality despite the fact that in proceeding, we go forward with a leap in *18 judicial reasoning rather than a measured pace. We go forward only because a potential deprivation of liberty is at stake without trial by jury. We do so in the spirit of those authorities quoted and with trepidation.
PERSPECTIVE
New York State has joined every other State in enacting special legislation for young people as called for in Judge Julian W. Mack’s brilliant plea for this noble social experiment contained in the Harvard Law Review (vol 23, p 104). In doing so, it has assumed a position contrary to that of the vast majority of States which fix the age of criminal responsibility at 18 with accompanying provision for waiver of the juvenile court’s jurisdiction to the criminal courts under appropriate circumstances.[1] Indeed, the very first pronouncement by the Supreme Court in this field was not Matter of Gault (387 US 1), which is now regarded as the groundbreaker, but Kent v United States (383 US 541), which dealt with due process requirements in the waiver hearing. In fixing the age of criminal responsibility at 16, New York joined a handful of only seven States and the Federal Government which set the age below 18 and joined it to a hybrid "youthful offender” category. This delineation was neither fish nor fowl; neither court nor prosecutor nor defendant could quite make out what was accomplished other than obscuring the real issue centering around an unwillingness to be fully benevolent up to age 18 on the one hand and a failure of sufficient candor to admit that the so-called benefits of this category were virtually nil on the other.[2] (Confronting Youth Crime, Twentieth Century Fund Task Force, 1978, p 94.) Moreover, even prior to the so-called Juvenile Justice Reform Act of 1976 which lowered the age for so-called "designated felonies” to 14, New York already had the most restrictive law and the lowest age for criminal responsibility in the nation. (Confronting Youth Crime, Twentieth Century Fund Task Force, 1978, p 46.) Now, two years later, when this too has failed because of this State’s lack of commitment to true rehabilitation, the Legislature has required that 14- and 15-year-olds (and some 13-year-olds) be tried directly in the criminal courts with juvenile jurisdiction inoperative unless the People originate the application for transfer thereto with the concurrence of the court of criminal jurisdiction. (1978 Extraordinary Session, S-5A; A- *19 43.) It is thus not untoward to comment that New York is now in the unenviable position of being the first State to abandon for all intents and purposes, the noble juvenile justice experiment which characterized the new humanism and enlightenment of the 20th century.
Taken in its classic sense, the juvenile proceeding was one in which the youth and society entered an implied contract by virtue of which the youth was to surrender certain procedural safeguards in exchange for benevolent treatment by the State. This contract has been the subject of a series of constitutional onslaughts which have widened the scope of procedural due process due a juvenile. In seriatim: Haley v Ohio (332 US 596), which held inadmissible a coerced confession to murder by a 15-year-old boy; Gallegos v Colorado (370 US 49), to the same effect where a 14-year-old boy was on trial; Kent v United States (383 US 541, supra), in which the court mandated that a juvenile court’s decision as to acceptance or waiver of jurisdiction must be made in accordance with basic due process and fairness; Matter of Gault (387 US 1, supra), which held the juvenile court procedures subject to due process clause of the Fourteenth Amendment and to embrace adequate written notice; advice as to right of counsel, retained or appointed; confrontation; cross-examination; and privilege against self incrimination; Matter of Winship (397 US 358), requiring a standard of proof beyond a reasonable doubt; McKeiver v Pennsylvania (403 US 528), rejecting the claim that juveniles are entitled to jury trials.
Until McKeiver, all that could be discerned from the trend of these cases was an uninterrupted whittling away of this "contract” by widening those rights which the juvenile was held not to have surrendered. Indeed, prognostication on the part of many was that if the trend went any further, nothing at all would be left as a quid pro quo for benevolent treatment. Thus, the decision in McKeiver was crucial in its own way, and created the necessity of deciding whether it was a trial by jury case or a so-called right to treatment holding, or both. In considering this issue we may be given insight into whether or not it called a halt to the Kent-Gault-Winship trend or was decided on the narrow issue of trial by jury. The right to treatment discussed herein (infra) will shed light on that issue.
TRIAL BY JURY
(a) the constitutional trend
In terms of geneology, the right to trial by jury as *20 "transferred” for the Sixth Amendment to the Fourteenth Amendment applicable to the separate States, exists in absolute form equal to but separate from the other classic "due process” rights (Duncan v Louisiana, 391 US 145). In Duncan, the Supreme Court held the right to trial by jury applicable to all crimes, felonies or misdemeanors, regardless of the niceties of language used by the individual State to describe them. This was followed by Baldwin v New York (399 US 66) in which the New York statute calling for trial of misdemenors by a three-Judge bench was struck down in the face of a new rule calling for trial by jury in any case where a sentence in excess of six months might be handed down.
As we pointed out in Matter of Linda G. v Theodore G. (74 Misc 2d 516), two interesting factors characterize the right to trial by jury: (a) despite its roots in Magna Carta and the common law to such an extent where codification thereof in the Constitution was declarative of a venerated institution, this right has only recently evolved to its present state of legal sophistication; (b) its development has closely paralleled that of the right to counsel. Most significant in terms of speculation as to future holdings concerning the right to trial by jury is the fact that both rights at one time had a maximum sentence of six months as a "boundary” which triggered the application of constitutional mandates (Baldwin v New York, supra; Gideon v Wainwright, 372 US 335); and that this dividing line has since been obliterated insofar as the right to counsel is concerned by the Supreme Court in Argersinger v Hamlin (407 US 25), which guaranteed counsel to any defendant facing incarceration for any period however minimal. In this light, a persuasive argument to the effect that Baldwin is only a step along the way to a line of constitutional decisions which may ultimately mandate trial by jury in any case where incarceration is called for could be made.
If indeed this trend exists, it is insufficient to influence our deliberations. It is relevant to point out that the Supreme Court has already rejected trial by jury in at least one instance where it mandated the right to counsel (see Matter of Gault, 387 US 1, supra; McKeiver v Pennsylvania, 403 US 528, supra) thus blunting the argument that ultimately it will treat both rights alike. Additionally, it has denied certiorari subsequent to Baldwin where jury trial was demanded and denied in a support proceeding involving civil commitment for *21 contempt where a period of incarceration of up to six months was at stake (Matter of Chase v Brooke, 34 AD2d 595, affd 27 NY2d 700; Brooke v Family Ct. of State of N. Y., County of Broome, 420 F2d 296, cert den 397 US 1000) in a case which would have given it an opportunity to strike down the six-month boundary if it were so inclined. We see no indication of that inclination from present actions. Should it turn out that this prognostication of the trend is erroneous, that factor, standing alone, is insufficient to move us to the declaration of unconstitutionality sought herein.
(b) juveniles and youthful offenders
Commencing with McKeiver v Pennsylvania (supra), holdings in this sphere may be traced as follows: McKeiver v Pennsylvania (403 US 528, supra), which upheld the denial of trial by jury in juvenile proceedings as being consonant with the informality usually associated therein and designed to eliminate a disruptive and formalizing force (decided on Fourteenth Amendment grounds under the United States Constitution and justifying this result by the availability of benevolent treatment);
Matter of Daniel D. (27 NY2d 90, cert den sub nom. D. v County of Onondaga, 403 US 926), which held that a jury trial is not mandated by the New York State Constitution in juvenile proceedings;
United States ex rel. Murray v Owens (465 F2d 289, cert den 409 US 1117), which held that a juvenile could be committed to an adult correctional facility without a jury trial while youths 16 and over receive the benefit of trial by jury before commitment to the same facility (based upon valid basis for classification);
Matter of George S. (44 AD2d 352, 353) reversing an order of the Family Court of granting trial by jury and upholding the New York statute denying same based upon a "rational basis for the demarcation of the age of 16” relying upon McKeiver v Pennsylvania (supra); United States ex rel. Murray v Owens (supra); Matter of Daniel D. (supra);
Matter of Janet R. v Cory (44 AD2d 599) to similar effect reversing an order of the Supreme Court, Richmond County, which granted prohibition against enforcement of the Elmira commitment provisions of section 758 of the Family Court Act in the absence of trial by jury;
Matter of William M. v Harold B. (90 Misc 2d 173), which *22 denied trial by jury to a juvenile accused of a designated felony under the Juvenile Justice Reform Act of 1976 who faced a mandatory minimum period of incarceration (decided under United States ex rel. Murray v Owens, supra, criteria).
A somewhat different evolution emerges concerning trial by jury for youthful offenders. In this sphere, courts no longer deal with youths under the age of criminal responsibility. That these are criminal proceedings in all regards irrespective of semantics, has been made painfully clear by the Court of Appeals in People v Michael A.C. (27 NY2d 79, 85), in which the court stated:
"Proceedings brought against youthful offenders are even less entitled to a 'civil’ label than those against juvenile delinquents. The former are clearly 'criminal’ in character and form. The youthful defendant is charged by indictment (or information) with a crime and he is tried in a criminal court, albeit in a part designated as the Youth Part. Moreover, it has long been the rule in youthful offender prosecutions that guilt of the specific acts charged against the defendant must be proven in accordance with the standards applied in a criminal trial. (See People v. Sykes, 22 N Y 2d 159; People v. Shannon, 1 A D 2d 226, 231-232, affd. 2 N Y 2d 792.) * * *
"In other words, as the Appellate Division observed in the Shannon case (1 A D 2d, at pp. 231-232), Insofar as its immediate effect and consequences are concerned, the adjudication, involving as it does a finding that the defendant is guilty of a crime * * * after a plea of guilty or a trial, and carrying with it the possibility of a commitment * * * and the preservation of the defendant’s finger-print records by the division of identification of the Correction Department * * * has all the essential features of a conviction as that term is ordinarily understood by lawyers and laymen alike.’ ”
The holding in People v Michael A. C. (supra) ruled unconstitutional the former code provision whereby a youth "voluntarily” waived trial by jury in exchange for consideration as a youthful offender (see, also, People v Sawyer, 33 AD2d 242; People v Philip M., 35 AD2d 557; People v David P., 35 AD2d 584; Nieves v United States, 280 F Supp 994).
The clarity with which juvenile proceedings are classified separately from those concerning youthful offenders which are fully criminal despite the State’s soft language seeking to dilute their real impact may be drawn from United States ex rel. Murray v Owens (465 F2d 289, supra), which went so far *23 as to leave untouched a juvenile commitment to an adult facility without trial by jury at the same time youths over 16 receive that benefit. Lest there be any misunderstanding of Murray’s import in terms of the right to treatment yet to be discussed, it should be emphasized that New York’s posture in the Federal courts with regard to youths between 16 and 19 is that the rationale for statutes affecting them may be found in benevolent treatment. (Gesicki v Oswald, 336 F Supp 371; see comment in ns 7 and 8, infra). This quid pro quo has been found both by the Court of Appeals (People v Michael A. C., 27 NY2d 79, supra) and by the Federal courts (Gesicki v Oswald, supra) to be wanting sufficiently to justify the statement that benevolent treatment which might form a basis for exemption of these proceedings from jury trial requirements under McKeiver are nonexistent. In considering the discussion to follow on the right to treatment, it must therefore be remembered that McKeiver, both by its own terms and by its logical position in the development of constitutional cases in this realm is as much concerned with that right as it is with trial by jury.
We turn now to the specific issues.
DECLARATION OF UNCONSTITUTIONALITY
We find CPL 340.40 (subd 7) constitutionally offensive and strike it down for the following reasons:
1 — THE CRIMES CHARGED ARE "SERIOUS” WITHIN CONSTITUTIONAL CRITERIA THUS MANDATING TRIAL BY JURY
A State may not by its own definition delineate a crime as "serious” under Sixth Amendment criteria and then indulge in the hypocrisy of calling it other than what it has created it to be.
The Sixth Amendment’s requirement of trial by jury for crimes has been held to refer to "serious” crimes as opposed to "petty” ones (Duncan v Louisiana, 391 US 145, supra; Baldwin v New York, 399 US 66, supra; District of Columbia v Clawans, 300 US 617; Cheff v Schnackenberg, 384 US 373). The emphasis of the Sixth Amendment is on the crime itself and not on the prospective punishment (Duncan v Louisiana, supra). Indeed, when Baldwin v New York (supra) set up the six-month line of demarcation between "serious” crimes and "petty” ones, it never undertook, even by its own terms, to redefine any crimes. Rather the six-month boundary was a convenient rule of thumb. Taken together, Duncan and Baldwin did not, could not, change the public policies of the *24 separate States. Rather, they took pains to insure that a State could not maneuver away from Sixth Amendment jury trial guarantees by the simple act of classifying a serious crime otherwise. If one considers the lowest common denominator of these holdings, they simply reaffirm what every freshman law student knows — that the law looks to substance rather than form. The high court has been very careful to leave to the separate States the power to set their own public policy; to delineate acts which they consider criminal, either "serious” or "petty”; the right to call forth moral condemnation of these acts by conviction; and the right to set punishment (Duncan v Louisiana, supra; Baldwin v New York, supra). The notion that the ultimate sentence imposed defines the nature of the crime a fortiori has received its share of Supreme Court condemnation (Cheff v Schnackenberg, supra [Harlan, J., concurring]). Moreover, it is clear from both Baldwin and Duncan that a "serious” crime may be, and when appropriate, must be defined as such even where a six-month sentence is not imposed by statute. (United States v Newberne, 427 F Supp 361; United States v Sanchez-Meza, 547 F2d 461; Muniz v Hoffman, 422 US 454; Douglass v First Nat. Realty Corp., 543 F2d 894; United States v Hamdan, 552 F2d 276.) In United States v Sanchez-Meza (supra), the court stated (pp 463-464):
"Baldwin did not hold that the maximum potential sentence was the sole criterion by which to determine whether an offense was petty; it said only that the maximum penalty was 'the most relevant’ objective criterion in making the petty or nonpetty determination * * *
"[W]e conclude that appellant was entitled to a jury trial, first, because the crime with which he was charged was an indictable and serious offense at common law, and second, because the crime itself is morally offensive and malum in se. ”
Similarly, in Brady v Blair (427 F Supp 5), the Federal court ruled that the Sixth Amendment as interpreted by Baldwin requires a jury trial on a charge of drunken driving although the maximum jail time is only six months. The court emphasized that in addition to the six months, the accused was subject to the loss of or suspension of his driving license, a $500 fine and community criticism. Regarding the latter, the court emphasized the "degree of ethical condemnation with which the community views the offense”, and ruled that "conviction * * * may have a substantial impact not only *25 upon the defendant’s liberty, but upon his financial resources, travel and occupation as well.” (427 F Supp at pp 9, 10.)
In the long run, the decision whether or not the crimes charged herein are to be considered "serious” or "petty” has already been made by the Legislature which has classified them as "serious”. The nature of the crimes cannot be changed, nor can the moral condemnation of society and the stigma of conviction be diluted simply by trimming some time off the prescribed sentences by sleight of hand (cf. People v Michael A. C., 27 NY2d 79, supra).
We thus conclude that these are "serious” crimes within the ambit of Duncan and Baldwin; that New York may not constitutionally deprive any defendant charged with either of them in the criminal justice system of trial by jury.
2 — THE PREDICATE NATURE OF A YOUTHFUL OFFENDER FINDING
Even if a first conviction becomes the subject of a mandatory youthful offender finding thus purporting not to be a criminal conviction, this finding itself may become a predicate in a subsequent prosecution wherein youthful offender status may be denied. Having been rendered in a constitutionally defective proceeding lacking trial by jury, its utility in the statutory scheme becomes null and void.
Under the statutory scheme, once a youth has been adjudicated a youthful offender, his treatment as such in a subsequent proceeding may be barred or denied in the court’s discretion (CPL 720.10 et seq.). In effect, this statutory scheme delineates the first such finding as a predicate sufficient to change the consideration the youth will receive at the time of sentence. Yet it accomplishes this end by providing for trial without jury in a proceeding which, if not for the special classification of youth versus adult recognized by the Supreme Court (McKeiver v Pennsylvania, 403 US 528, supra; People ex rel. Wayburn v Schupf, 39 NY2d 682) would be constitutionally defective. We respectfully submit that the "youth-adult” classification does not apply here. We are not now faced with a youth who, being given special benevolent treatment may be classified separately from an adult. In reality, the classes matched against each other in this instance are youths with no convictions as against youths with prior convictions. In so doing, the State moves a youth from one category to another on the basis of State action via its courts which deny the right to trial by jury. This it may not do constitutionally.
*26 The concept of a predicate crime forming the basis for different treatment and/or increased punishment of a defendant has been upheld (People v Parker, 41 NY2d 21; People v Gowasky, 244 NY 451; Graham v West Virginia, 224 US 616). But basic to these holdings is the proposition that in order to serve as a predicate crime, an underlying conviction or finding must have been constitutionally rendered (People v West, 41 AD2d 987; People v Harley, 37 AD2d 742; People v Lasky, 31 NY2d 146). New York has codified the cases so holding in CPL 400.21 its predicate felony statute which reads: "(b) A previous conviction in this or any other jurisdiction which was obtained in violation of the rights of the defendant under the applicable provisions of the constitution of the United States must not be counted in determining whether the defendant has been subjected to a predicate felony conviction. The defendant may, at any time during the course of the hearing hereunder controvert an allegation with respect to such conviction in the statement on the grounds that the conviction was unconstitutionally obtained.”
An indication of this State’s zealousness to protect a defendant from imposition of sanctions based upon an allegedly unconstitutional predicate conviction may be obtained from People v Taylor (86 Misc 2d 445) in which the court held that burden of proving constitutionality of the predicate crime was upon the People.
Finally we note People v Shannon (1 AD2d 226, affd 2 NY2d 792) in which it was held that the primary purpose of the youthful offender law is to prevent the imposition of increased punishment on a subsequent conviction of this defendant of a crime. In effect therefore, the State of New York not only establishes the first (viz., mandatory) youthful offender finding as a predicate or basis for denial of such treatment in a future prosecution without a constitutionally mandated trial by jury, but does so even in the face of holdings characterized by Shannon which disapprove the concept of escalating punishment.
On this basis, we find a second ground to declare the statute under attack constitutionally offensive.
3 — THE RIGHT TO TREATMENT CASES
The annals of constitutional law may well single out the decade of the 1960’s as the most fertile and creative in history. As an offshoot to an unparalleled expansion of constitutional frontiers, the landmark decisions of the Supreme *27 Court also triggered lower courts and intermediate courts of appeal to extend themselves and grant recognition to new and innovative doctrines, ideas which were so far ahead of their time that they are first reaching the high court in the middle and late 70’s. One of these children of the 60’s is that line of authority which has come to be known as the "right to treatment” cases. These cases which were originally litigated in the field of mental health held in effect that where a State guarantees benevolent treatment to a classified group, and thereby deprives an individual of liberty for any period however brief through proceedings which lack any element of classical Fourteenth Amendment due process, it is under a positive obligation to furnish treatment. When a State deprives an individual of liberty in the name of treatment and fails to furnish it, the cause or pretense of detention becomes illusory thus rendering further confinement constitutionally unlawful.
In Sas v State of Maryland (334 F2d 506), the Fourth Circuit Court of Appeals considered a statute providing for commitment of mental defectives. The court gave judicial recognition to the right to treatment and remanded for appropriate considerations on specifics thereof.[3]
Thereafter, Rouse v Cameron (373 F2d 451), decided by the Circuit Court of Appeals for the District of Columbia, sustained a writ of habeas corpus brought by a petitioner involuntarily committed to a mental hospital on an acquittal of a criminal offense by reason of insanity on the basis of a cognizable right to treatment. The court stated (p 453) that "Indefinite confinement without treatment of one who has been found not criminally responsible may be so inhumane as to be 'cruel and unusual punishment’ ”.[4]
*28 Again, in Wyatt v Stickney (325 F Supp 781), the United States District Court intervened in the internal affairs of the State of Alabama which ranked 50th among the States in the per capita expenditure for psychiatric patients and ordered a plan to be submitted whereby these conditions would be remedied, stating in part (p 785): "There can be no legal (or moral) justification for the State of Alabama’s failing to afford treatment — and adequate treatment from a medical standpoint — to the several thousand patients who have been civilly committed to Bryce’s for treatment purposes. To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process.”
The right to treatment received its final recognition by the United States Supreme Court in O’Connor v Donaldson (422 US 563), reversing on other grounds, a decision of the Circuit Court (493 F2d 507) which summarized the decisions to date. (See Burger, Ch. J., concurring.)
The importance of the right to treatment cases and Supreme Court approval thereof becomes apparent from the fact that this interpolated right which first saw the light of day as applied to mental patients was extended to juvenile proceedings before O’Connor reached the Supreme Court. Thus, the classic "contract” between the juvenile and society already alluded to herein was redefined by making the next logical extension of the Kent-Gault-Winship trend, a recognition that deprivation of the right to trial by jury as upheld by McKeiver v Pennsylvania (403 US 528, supra), was in exchange for the right to treatment. When a youth is therefore committed by judicial proceedings which are defective constitutionally in that they lack trial by jury, he becomes the beneficiary of a positive right to treatment (Morales v Turman, 364 F Supp 166; Martarella v Kelley, 349 F Supp 575; Inmates of Boys’ Training School v Affleck, 346 F Supp 1354). As the court stated in Inmates of Boys’ Training School v Affleck (supra, pp 1364-1365): "the constitutional validity of present procedural safeguards in juvenile adjudications, which *29 do not embrace all of the rigorous safeguards of criminal court adjudications, appears to rest on the adherence of the juvenile justice system to rehabilitative rather than penal goals * * * Thus due process in the juvenile justice system requires that the post-adjudicative stage of institutionalism further this goal of rehabilitation. And whatever deviations, if any, from this goal of rehabilitation which might be tolerated as to those incarcerated juveniles convicted of violations of the criminal laws, such deviations are far less tolerable for the other classes of children incarcerated by the state. See Rozecki v Gaughan, 459 F.2d 6 (1st Cir.1972).”[5]
Again, in Morales v Turman (supra, p 175 the court stated: "the commitment of juveniles to institutions under conditions and procedures much less rigorous than those required for the conviction and imprisonment of an adult offender gives rise to certain limitations upon the conditions under which the state may confine the juveniles. This doctrine has been labelled the 'right to treatment,’ and finds its basis in the due process clause of the fourteenth amendment. See, e.g., Nelson v. Heyne, supra at 459 of 355 F. Supp.; Inmates v. Affleck, supra; see also Wyatt v. Stickney, 325 F. Supp. 781 (M.D. Ala.1971) (mental institutions), discussed in 86 Harv.L.Rev. 1287 (1973). Thus juveniles committed to the custody of the Texas Youth Council enjoy both a state statutory and a federal constitutional 'right to treatment.’ ”
In Martarella v Kelley (349 F Supp 575, 599, supra), Judge Lasker held: "There can be no doubt that the right to treatment, generally, for those held in non-criminal custody (whether based on due process, equal protection or the Eighth Amendment, or a combination of them) has by now been recognized by the Supreme Court, the lower federal courts and the courts of New York.” And concerning the right to treat *30 ment as it pertains to juveniles (p 600): "In sum, the law has developed to a point which justifies the assertion that: 'A new concept of substantive due process is evolving in the therapeutic realm. This concept is founded upon a recognition of the concurrency between the state’s exercise of sanctioning powers and its assumption of the duties of social responsibility. Its implication is that effective treatment must be the quid pro quo for society’s right to exercise its parens patriae controls. Whether specifically recognized by statutory enactment or implicitly derived from the constitutional requirements of due process, the right to treatment exists.”
While it may be argued that youthful offenders have reached the age of criminal maturity, thus rendering inapposite those right to treatment cases dealing with juveniles, the Martarella court cites three instances (supra, p 600), youthful offenders among them, in which New York courts have recognized a constitutional right to treatment in nonjuvenile and/ or nonmental patient situations: (a) People ex rel. Kagonovitch v Wilkins (23 AD2d 178 [retaining sex offender in custody in spite of absolute failure to provide treatment as cruel and unusual punishment]); (b) People ex rel. Meltsner v Follette (32 AD2d 389 [youthful offender must be furnished rehabilitative treatment]);[6] (c) Matter of Lloyd (33 AD2d 385 [declaring Legislature’s obligation to make available necessary facilities to provide treatment for noncriminally detained]).
Additionally, the court places reliance upon Gesicki v Oswald (336 F Supp 371, supra) in which a three-Judge constitutional court in striking down New York’s wayward minor law, mandated the right to treatment and equated juveniles (under 16) and youths (16-19).[7]
We thus arrive at the inevitable conclusion that the State of New York by providing for a constitutionally defective trial for mandatory youthful offenders, is under a concomitant obligation to provide treatment, an obligation it makes no pretense at meeting. While the statute provides for benign handling of youthful offenders, it is totally silent on the issue of treatment. We therefore find New York’s youthful offender *31 statute constitutionally defective as failing to provide constitutionally mandated treatment as quid pro quo for denial of trial by jury. In doing so, we find no need to reach other issues which may lead to the same conclusion, viz., adequacy of sealing and conviction vacatur provisions as quid pro quo.[8]
It is sufficient at this point to find that a constitutionally mandated right to treatment such as would support the statute in question does not exist.
PRIOR HOLDINGS
Finally, we are called upon to weigh the import of the two cases decided in this State on this question.
In People v Carolyn S. (92 Misc 2d 674), the City Court of Mount Vernon declared the statute in question unconstitutional on the basis of its holding that a period of probation, either standing alone or in combination with a term of incarceration of less than six months, which exceeds the six-month boundary delineated in Baldwin is a sufficient criminal sanction to mandate trial by jury. While we concur with the result therein, we respectfully differ with its reasoning. The United States Supreme Court has specifically excluded probation from the ambit of trial by jury (Frank v United States, 395 US 147). Moreover, in People v Gregory L. (28 AD2d 68), it was held that revocation of probation and subsequent imprisonment cannot be tested by appeal from the original sentence and/or conviction, but only by way of habeas corpus. Implicit in this holding is an attitude of appellate courts that sanctions by way of incarceration which have their genesis in an original term of probation are independent and do not revert back to the original judgment of conviction.
The other case with which we must deal is People v *32 Joseph M. (84 Misc 2d 1046) which upholds the constitutionality of denial of trial by jury to a mandatory youthful offender on the theory of a valid basis for classification between adults and young persons. This basis for classification has been upheld often enough to be beyond dispute. But we respectfully submit that the wrong classes are being matched against each other. When one young person commits the same alleged act committed by another youth of the same age and is tried without a jury because his proposed youthful offender status is mandatory upon conviction as opposed to the other’s discretionary status because of a prior record, it is not young person against adult which is the class under constitutional attack, but young person without a record as against young person with a record. It is in this sphere that we can see no basis for classification especially where the once convicted offender loses his mandatory protection by virtue of an underlying conviction — or finding if one finds that term more palatable— in which he has not been afforded the constitutional right to trial by jury. Moreover, our brother in Joseph M. assumes, as does our Legislature, that the sole criteria to delineate a crime as serious according to Duncan and Baldwin is the six-month period of incarceration. We respectfully disagree. Finally, Joseph M. was decided without reference to the right to treatment recognized by a three-Judge Federal constitutional court as applicable to the age group we consider here in Gesicki v Oswald (336 F Supp 371, supra) and other holdings cited.
Accordingly, we respectfully dissent from the reasoning of Carolyn S. and from the result in Joseph M.
ORDER
The motion to declare CPL 340.40 (subd 7) unconstitutional and for trial by jury is granted. Upon completion of preliminary proceedings in the part of origin, this case shall be transferred to the jury part for proceedings consistent with this opinion.

. New York is one of only two States without waiver statutes.

. See note 8 (infra) for comment of Federal court.

. The Sas court stated (p 516): "For those in the category who are treatable it would substitute psychiatric treatment for punishment in the conventional sense and would free them from confinement, not when they have 'paid their debt to society,’ but when they have been sufficiently cured to make it reasonably safe to release them. With this humanitarian and progressive approach to the problem no person who has deplored the inadequacies of conventional penological practices can complain. But a statute though 'fair on its face and impartial in appearance’ may be fraught with the possibility of abuse in that if not administered in the spirit in which it is conceived it can become a mere device for warehousing the obnoxious and antisocial elements of society.”

. The Rouse court stated (pp 458-459): "One who is 'in custody in violation of the Constitution and laws’ of the United States is entitled to relief in habeas corpus, and the court is required to 'dispose of the matter as law and justice require.’ If the court finds that a mandatorily committed patient, such as appellant, is in custody in *28 violation of the Constitution and laws, it may allow the hospital a reasonable opportunity to initiate treatment * * * Unconditional or conditional release may be in order if it appears that the opportunity for treatment has been exhausted or treatment is otherwise inappropriate. It is unnecessary to detail the possible range of circumstances in which release would be the appropriate remedy.”

. The Afñeek court also quoted from State ex rel. Londerholm v Owens (197 Kan 212, 223):
"The validity of the whole juvenile system is dependent upon its adherence to its protective, rather than its penal, aspects. Dispensing with formal constitutional safeguards can be justiñed only so long as the proceedings are not, in any sense, criminal.
"We hold confinement in a penal institution will convert the proceedings from juvenile to criminal and require the observance of constitutional safeguards. The noncriminal aspect is the legal backbone of the constitutionality of all American juvenile court legislation. If after a juvenile proceeding, the juvenile can be committed to a place of penal servitude, the entire claim of parens patriae becomes a hypocritical mockery.”

. We respectfully disagree with the Martarella court’s reading of Melsner. Were we in agreement therewith, we would have no hesitancy to cite Martarella as controlling on the issues before us rather than persuasive.

. It is interesting to note that the right to treatment was relied upon by the State of New York in Gesicki and its existence as a positive right first asserted by the State in a vain effort to have it serve as a basis to uphold constitutionality.

. The Gesicki court was unimpressed with the alleged nonpenal character of proceedings governing the age group of 16-19 and so stated (p 377): "In attempting to show that the statute is not criminal or penal, the state relies on N. Y. Code Grim. Proc. § 913-dd, which provides that an adjudication under § 913-a may not disqualify the minor from public employment or deprive him or her of any right or privilege. Nor is a wayward minor 'denominated a criminal . . . nor shall such determination be deemed a conviction.’ ”
Of the two points, the second is at the same time the least tenable and the most pernicious, because it suggests that constitutional protections can be circumvented by "soft” language. Professor Lon Fuller has aptly captured in a sentence the potential for eroding due process guarantees were labels unquestionably accepted as describing reality: "When an attempt is made to hide the harsh realities of criminal justice behind euphemistic descriptions, a corrupting irony may be introduced into ordinary speech that is fully as frightening as Orwell’s 'Newspeak’.” (Anatomy of the Law, p 33.)